# 25-3083

## United States Court of Appeals
### for the
### Second Circuit

CANANDAIGUA NATIONAL CORPORATION,

*Petitioner,*

– v. –

BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM,

*Respondent.*

ON APPEAL FROM THE FEDERAL RESERVE BOARD
FRB ORDER NO. 2025-17

## BRIEF FOR PETITIONER

JEFFREY A. WADSWORTH
LAURA A. HIGGINS
HARTER SECREST & EMERY LLP
*Attorneys for Petitioner*
1600 Bausch & Lomb Place
Rochester, New York 14604
(585) 232-6500

CP COUNSEL PRESS    (800) 4-APPEAL • (390975)

**IN THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

---

CANANDAIGUA NATIONAL CORPORATION,

                Petitioner,

          v.

BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM,

                Respondent.

**CORPORATE DISCLOSURE STATEMENT PURSUANT TO FRAP 26.1**

Case No. 25-3083

---

Petitioner Canandaigua National Corporation by and through its attorneys, Harter Secrest & Emery LLP, as and for its Corporate Disclosure Statement pursuant to Federal Rule of Appellate Procedure 26.1, states as follows:

Canandaigua National Corporation has no parent corporation and no publicly held corporation owns 10% or more of its stock.

Dated:    December 9, 2025

By:   /s/ Jeffrey A. Wadsworth
       Jeffrey A. Wadsworth, Esq.
       Laura A. Higgins, Esq.
       HARTER SECREST & EMERY LLP
       1600 Bausch and Lomb Place
       Rochester New York 14604
       Tel.: (585) 232-6500
       Email: jwadsworth@hselaw.com
            lhiggins@hselaw.com

*Attorneys for Petitioner Canandaigua National Corporation*

# **TABLE OF CONTENTS**

**Page(s)**

TABLE OF AUTHORITIES ................................................................. iii

JURISDICTIONAL STATEMENT ...................................................... 1

STATEMENT OF ISSUES PRESENTED FOR REVIEW ................................ 3

STATEMENT OF THE CASE ........................................................... 5

      A.    The Nature of the Case, Course of Proceedings, and Disposition Below ......................................................... 5

      B.    Statement of Facts ................................................... 6

           1.    *CNB Mortgage's Declining Market Share* ......................... 6

           2.    *CNC's Proposed Cash Guarantee Mortgage Program* ................ 8

           3.    *The Board's Timeline to Decision* ................................ 11

      C.    The Board's Rationale .............................................. 14

      D.    The Applicable Statutory and Regulatory Scheme ................. 16

SUMMARY OF THE ARGUMENT ....................................................... 19

STANDARD OF REVIEW ............................................................... 22

ARGUMENT ............................................................................ 23

    I.    THE BOARD WRONGLY ADOPTED A PER SE APPROACH AGAINST AN FHC'S PURCHASE OF REAL PROPERTY THAT IS WHOLLY INCONSISTENT WITH THE GLB ACT'S COMPLEMENTARY ACTIVITIES FRAMEWORK ......................................... 23

    II.    THERE IS NO SUPPORT, LET ALONE SUBSTANTIAL EVIDENCE, FOR THE BOARD'S FINDING THAT CNC'S PROPOSED CASH GUARANTEE MORTGAGE PROGRAM POSES A SUBSTANTIAL RISK TO THE SAFETY OR SOUNDNESS OF DEPOSITORY INSTITUTIONS OR THE FINANCIAL SYSTEM GENERALLY ......................... 30

A.     The Board Did Not Meaningfully Engage in a Safety and Soundness Analysis. ........................................... 30

B.     The Board Noted but Disregarded the Critical Safeguards Built Into CNC's Proposed Program ..................... 35

III.     THIS COURT CAN AND SHOULD CONCLUDE THAT CNC'S PROPOSED PROGRAM MEETS THE OTHER STATUTORY ELEMENTS AND ORDER THE BOARD TO APPROVE THE PROGRAM. ................................................................. 38

A.     CNC's Proposed Cash Guarantee Mortgage Program "Is Complementary to a Financial Activity". .......................... 38

B.     CNC's Proposed Cash Guarantee Mortgage Program Could Be Expected to Produce Benefits to the Public That Outweigh Possible Adverse Effects ............................... 40

C.     This Court Has Authority to Reach These Issues. ................... 43

IV.     CNC'S NOTICE SHOULD BE "DEEMED APPROVED" BECAUSE THE BOARD IS NOT PERMITTED TO EXERCISE ITS LIMITED RIGHT TO GRANT ITSELF EXTENSIONS MORE THAN ONCE .................. 44

CONCLUSION ....................................................... 51

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Central Wisconsin Bankshares, Inc. v. Board of Governors of Federal Reserve System,*
583 F.2d 294 (7th Cir. 1978) ...................................................... 50

*Citicorp v. Board of Governors of Federal Reserve System,*
589 F.2d 1182 (2d Cir. 1979) ..................................................... 49

*Guertin v. United States,*
743 F.3d 382 (2d Cir. 2014) ....................................................... 44

*Loper Bright Enterprises v. Raimondo,*
603 U.S. 369 (2024) ................................................................... 22

*National Bank v. Matthews,*
98 U.S. 621 (1878) ....................................................... 14, 24, 25

*North Lawndale Economic Development Corp. v. Board of Governors of Federal Reserve System,*
553 F.2d 23 (7th Cir. 1977) (per curiam) ............................. 22, 49

*The Art & Antique Dealers League of Am., Inc. v. Seggos,*
121 F.4th 423 (2d Cir. 2024) ..................................................... 22


STATUTES

12 U.S.C. § 29 ............................................................. 10, 25, 31

12 U.S.C. § 1843(k) ............................................................. *passim*

12 U.S.C. § 1848 ...................................................... 1, 2, 22, 44

iii

**REGULATIONS**

12 C.F.R. § 225.22 ................................................................................. 35

12 C.F.R. § 225.28 ................................................................................. 40

12 C.F.R. § 225.81 ................................................................................. 17

12 C.F.R. § 225.89 ............................................................................ 16, 18

12 C.F.R. § 262.3 ................................................................................... 1

**RULES**

Complementary Activities, Merchant Banking Activities, and
Other Activities of FHCs Related to Phys. Commodities, 79
Fed. Reg. 3329 (notice of proposed rulemaking Jan. 21,
2014) ................................................................................................ 18, 39

Financial Subsidiaries, 66 Fed. Reg. 307
(proposed Jan. 3, 2001) (to be codified at 12 CFR pt. 225) ............. 18, 26

**ADMINISTRATIVE ORDERS**

*Barclays Bank PLC*,
90 Fed. Res. Bull. 511 (2004) ............................................................. 31

*Citigroup Inc.*,
89 Fed. Res. Bull. 508 (2003) ................................................. 31, 32, 38

*Deutsche Bank AG*,
92 Fed. Res. Bull. C54 (2006) ............................................................ 31

*Fortis S.A./N.V. et al.*,
94 Fed. Res. Bull. C20 (2008) ............................................................ 33

*JPMorgan Chase & Co.*,
92 Fed. Res. Bull. C57 (2006) ............................................................ 32

*Société Générale*,
92 Fed. Res. Bull. C113 (2006) ........................................................ 32

*The Royal Bank of Scotland Group plc*,
94 Fed. Res. Bull. C60 (2008) ...................................................... 18, 33

*UB Financial Corp.*,
58 Fed. Res. Bull. 428 (1972) ....................................................... 24, 25

*UBS AG*,
90 Fed. Res. Bull. 215 (2004) ............................................................ 31

*Wellpoint, Inc.*,
93 Fed. Res. Bull. C133 (2007) ................................................... 34, 36


**LEGISLATIVE HISTORY**

145 Cong. Rec. H11527 (daily ed. Nov. 4, 1999)
(statement of Rep. James A. Leach) ......................................... 29, 32, 43


**MISCELLANEOUS**

Michelle Bowman, Vice Chair for Supervision, Fed. Rsrv. Bd.,
Revitalizing Bank Mortgage Lending, One Step with Basel
(Feb. 16, 2026) Speech at the Am. Bankers Ass'n 2026
Conf. for Cmty. Bankers,
https://www.federalreserve.gov/newsevents/speech/bowman
20260216a.htm [https://perma.cc/AA9W-YE5N] ................................ 41

v

# JURISDICTIONAL STATEMENT

Respondent Board of Governors of the Federal Reserve System (the "Board" or "FRB") had statutory authority to review Petitioner Canandaigua National Corporation's ("CNC") application for approval of CNC's proposed Cash Guarantee Mortgage Program (the "Notice") pursuant to 12 U.S.C. § 1843(j), (k).  In an Order issued on October 17, 2025, the Board disapproved the Notice. (PA 216-226).[1]  On October 31, 2025, Petitioner CNC timely submitted a request for reconsideration to the Board pursuant to 12 C.F.R. § 262.3(k).  (PA 236-244).  The Board issued a final action letter in which it denied the request for reconsideration on November 10, 2025, thereby exhausting Petitioner's administrative remedies.  (PA 245-247). Petitioner timely filed its Petition for Review with this Court on December 8, 2025.  (Dkt. 1.1).

This Court has jurisdiction over this matter pursuant to 12 U.S.C. § 1848, which provides that any party aggrieved by an order of the Board under Chapter 17 of Title 12 of the United States Code "may obtain a review of such order in the United States Court of Appeals within any circuit wherein such party has its principal place of business."  Petitioner CNC is a party aggrieved by the Board's orders of October 17, 2025 and

---

[1] Citations to "PA ___" are to Petitioner's Appendix.

November 10, 2025, and CNC's principal place of business is in the State of New York.  This Court has "the jurisdiction to affirm, set aside, or modify the order of the Board and to require the Board to take such action with regard to the matter under review as the court deems proper."  12 U.S.C. § 1848.

## <u>STATEMENT OF ISSUES PRESENTED FOR REVIEW</u>

Petitioner CNC is a financial holding company ("FHC") within the meaning of 12 U.S.C. § 1843(k) and is subject to the supervisory authority of the FRB.  CNC submitted an application—"the Notice"—to the FRB seeking approval of its proposed Cash Guarantee Mortgage Program under 12 U.S.C. § 1843(k)(1)(B) as complementary to a financial activity. Congress added the "complementary activity" provision as part of the Gramm-Leach-Bliley Financial Services Modernization Act of 1999 ("GLB Act").  The Cash Guarantee Mortgage Program is designed to complement CNC's subsidiary-based lending business to give mortgage-dependent residential home buyers a means of competing with all-cash offers. Seventeen months after receiving the Notice, the Board disapproved CNC's request.

The issues presented for review are:

1. Whether the FRB's rigid imposition of a *per se* prohibition on FHCs purchasing and selling real property was contrary to the GLB Act's "complementary to a financial activity" provision.

2. Whether there was substantial evidence to support the FRB's conclusion that CNC's proposed Cash Guarantee Mortgage Program would pose a substantial risk to the safety or soundness of The Canandaigua

National Bank and Trust Company, depository institutions, and the financial system generally in light of the program's risk mitigation safeguards, including that (i) CNC would guarantee performance only on real estate purchase contracts where the purchase price does not exceed the mortgage preapproval amount, (ii) CNC's mortgage subsidiary's historical final mortgage disapproval rate was just 0.67%, (iii) CNC would cap its aggregate real estate holdings purchased under the program at no more than $5,000,000 at any one time, and (iv) CNC would dispose of any real property purchased under the program as quickly as prudently possible and no later than two years from purchase.

    3.      Whether the proposed Cash Guarantee Mortgage Program is "complementary to a financial activity."

    4.      Whether the proposed Cash Guarantee Mortgage Program could be expected to produce benefits to the public that outweigh possible adverse effects.

    5.      Whether the Bank Holding Company Act ("BHC Act") permits the Board to exercise the 30-day and 90-day extensions provided for in 12 U.S.C. §§ 1843(j)(1)(C)(ii) and (j)(1)(E), respectively, more than once.

## STATEMENT OF THE CASE

### A.     The Nature of the Case, Course of Proceedings, and Disposition Below.

This case presents important questions of law regarding whether the FRB must exercise its discretion in a manner consistent with Congress's intent, in accordance with the statutorily prescribed timeline, and based on factual findings that are supported by substantial evidence.

CNC is an FHC and controls The Canandaigua National Bank and Trust Company ("Canandaigua Bank"), which is a community bank operating exclusively in the State of New York, as well as Canandaigua Mortgage Company ("CNB Mortgage"), which is a subsidiary of Canandaigua Bank.  CNC and its community banking subsidiaries concentrate most of their services in the Greater Rochester/Western New York geographic area.

On May 17, 2024, CNC submitted the Notice seeking approval of its proposed Cash Guarantee Mortgage Program as an acceptable complementary activity under the GLB Act provisions applicable to FHCs. CNC's ability to offer its proposed Cash Guarantee Mortgage Program is critical to attracting mortgage customers in CNC's Western New York market, where private nonbank lending institutions and credit unions have

been administering similar programs and taking market share from trusted, long-standing, and well-regulated community banking entities like CNC.

On October 17, 2025, following multiple requests for additional information, the FRB issued an Order disapproving CNC's application. On October 31, 2025, CNC timely submitted a Request for Reconsideration of the Board's October 17, 2025 Order (PA 236-244), which the FRB denied on November 10, 2025. (PA 245-247).

CNC's Petition to this Court followed.

### B. Statement of Facts.

#### 1. *CNB Mortgage's Declining Market Share.*

In recent years, CNB Mortgage has experienced a precipitous drop in its first-time home buyer mortgage line of business. Based on customer reports, CNC believes that the primary reason for this decline in its lending subsidiary's first mortgage closings is a result of cash guarantee programs that its nonbank lending competitors in Western New York provide to allow mortgage-dependent residential home buyers to compete with those prospective buyers making all-cash offers. (PA 194). Under the programs administered by these nonbank lenders, prospective mortgage-dependent buyers provide the lender with an earnest money deposit, and the lender then provides the seller with a written guarantee that should the buyer fail to

attain final mortgage approval, the lender will step into the buyer's shoes and consummate the transaction under an assignment of the sale contract. (PA 7-8, 16-20).

Petitioner believes Premium Mortgage Corporation ("Premium") was the first nonbank mortgage lender to introduce such a cash guarantee mortgage program in the Greater Rochester, New York region in 2020. (PA 120, 139). After initiating its program, Premium quickly began increasing its share of first mortgage closings and CNB Mortgage saw corresponding declines in its share. (PA 129). After Premium launched its cash guarantee mortgage program, the gap between Premium's first mortgage closings and CNB Mortgage's grew from approximately $152.2 million in 2020 to $377 million by 2024. (PA 129-130).

Notably, while Premium has significantly increased its share of first mortgage closings after introducing the cash guarantee mortgage offering, it has rarely had to purchase a home under its guarantee. During the first four years of its program, Premium reportedly closed 1,378 cash guarantee transactions for residential properties, of which only five (5) failed to obtain final mortgage approvals and required Premium to exercise its purchase obligations under the guarantee. (PA 120, 139).

7

Other mortgage lender competitors of CNB Mortgage in the Greater Rochester area have followed Premium in implementing similar programs, including ESL Federal Credit Union, Howard Hanna Mortgage Services, and Hunt Mortgage.  (PA 121).

### 2.   *CNC's Proposed Cash Guarantee Mortgage Program.*

To compete more effectively with those regional nonbank mortgage lenders offering cash guarantee mortgage programs for residential home buyers, CNC filed a notice with the FRB requesting permission to offer a similar program.  CNC's proposed Cash Guarantee Mortgage Program (the "Program") would be made available to prospective home buyers who have received mortgage pre-approval from CNB Mortgage.[2]  Under the Program, CNC would provide a written guarantee to the seller of a residential real estate property that CNC will purchase the property if the prospective pre-approved home buyer does not receive final mortgage approval from CNB Mortgage.  Interested mortgage customers would provide an earnest money deposit ("EMD") of 15 percent of the purchase price to the seller's listing real estate agency or real estate closing attorney to hold in escrow.

---

[2] A detailed, step-by-step description of how the Program would function from start to finish is set forth in CNC's December 5, 2024 Response to the FRB's Second Request for Additional Information.  *See* PA 105-109.

8

Under the Program, CNC would guarantee performance only on real estate purchase contracts where the purchase price does not exceed the mortgage preapproval amount authorized by CNB Mortgage. (PA 17, ¶ 2). If the buyer obtains final mortgage approval, the buyer purchases the property pursuant to the purchase agreement, with the EMD released or applied at the buyer's direction. (PA 107). If the buyer fails to uphold and maintain the criteria needed to finalize the mortgage loan, and if the seller demands that CNC exercise its purchase obligations under the guarantee, then the buyer forfeits the EMD, and the seller remits the EMD to CNC to apply to closing costs incurred in CNC's purchase of the property.[3] After purchase, CNC would dispose of the property as quickly as possible.

Based on the historical final mortgage declination rate following preapproval by CNB Mortgage, which is just 0.67%, CNC anticipated needing to act on a guarantee and purchase for, at most, two homes per year

---

[3] After subtracting from the EMD reasonable closing costs and fees to acquire and sell the property, CNC would otherwise be required to return all remaining EMD funds to the buyer customer. (PA 9, 90). If CNC's sale of real property under the Program resulted in a profit to CNC, those funds would first be applied to reimburse the buyer the full amount of the EMD. (PA 9, 91, 108). All aspects of the EMD and the Program are disclosed to, and agreed by, the borrower at the time he or she seeks to participate in the Program offering. (PA 17-20).

with a total annual working capital need of $251,500. (PA 81-82, 105, 115, 185).[4]

As an additional safeguard, CNC would cap its aggregate real estate property holdings at any one time under the Program at $5 million, which accounts for less than 0.1% of CNC's approximately $5 billion in total assets. (PA 186, 197). CNC further committed under the Program to treat any purchased parcel as other real estate owned ("OREO"), and to dispose of title to the real property as promptly as prudently possible and no longer than two years from purchase. (PA 113).[5]

CNC's anticipated annual revenue from the program is approximately $1.3 million, as compared to CNC's total annual revenue in 2023 of $184.3 million. (PA 105). CNC anticipated no profit or loss from the very limited

---

[4] CNB Mortgage's historical rate is consistent with Premium's reported experience of having to purchase just five homes compared to 1,378 mortgage closings under its cash guarantee program, i.e., 0.36%. (PA 120, 139).

[5] CNC thus intends to dispose of properties that it obtains through the Program on a far more accelerated timeline than the law generally requires for OREO. *See* 12 U.S.C. § 29 (imposing a five-year holding period for other real estate owned by national banking associations, with an ability to extend by another five years). Canandaigua Bank's OREO guidelines apply, for example, to real estate that it holds as the result of the satisfaction of a customer's debts, such as in a foreclosure of a mortgage customer's real property. Although the law allows Canandaigua Bank to hold OREO for five years, Canandaigua Bank historically relists OREO property within one month of ownership and sells the property within six months. (PA 113).

number of parcels it expected it would be required to purchase and quickly dispose of under the Program. (PA 105; 108 ("It is doubtful owing to the short timeframe in which CNC would execute on the guarantee and sell the subject property that much, if any, market condition swing would occur.")).

CNC's proposed Program is intended to complement its subsidiary's lending business to furnish mortgage-dependent residential home buyers a means of competing with all-cash offers. In addition, the Program would offer the community an option of utilizing a trusted, long-standing, and well-regulated national bank for its guaranteed mortgage loan product instead of private nonbank lending institutions or credit unions.

The Program would only be used for residential loans originated by CNC's lending subsidiary. Should community participants in the local residential real estate market no longer require guarantees, then CNC would discontinue the Program as it would no longer be needed to remain competitive. The Program's availability is tethered to the need to support CNB Mortgage's lending business. (PA 112-115).

### 3. *The Board's Timeline to Decision*.

On May 17, 2024, CNC filed its application with the FRB seeking approval of its proposed Program as a complementary activity pursuant to 12 U.S.C. § 1843(k)(1)(B) and FRB-promulgated regulations. *See* Bank

Holding Companies and Change in Bank Control ("Regulation Y"), 12 C.F.R. § 225 (2025); (PA 6-22).[6]

On May 23, 2024, the Federal Reserve Bank of New York acknowledged receipt of CNC's application, noting that the application "is being processed" by the FRB, that it was "expect[ed] that the Board will act on [CNC's] notice by July 16, 2024," and that "[i]f the Board is unable to act within 60 days, [CNC] will be notified." (PA 24).

On July 16, 2024, the FRB confirmed "[t]he 60th day after the filing was received is July 16, 2024," and advised that "[t]he processing period for the application has been extended to facilitate further review of the statutory factors" and that "[t]he time extension will not exceed the period provided in [12 U.S.C. § 1843(j)(1)(E)]." (PA 26).

On October 3, 2024, the FRB sent CNC a request for additional information ("First Request for Additional Information"). (PA 73-77). On October 15, 2024, CNC provided its response to the First Request for Additional Information. (PA 80-93).

---

[6] Schedule 1 to CNC's May 17, 2024 application contained some confidential customer information. CNC later resubmitted its application in redacted form in September 2024. (PA 27-59). Only the redacted form of Schedule 1 is provided in Petitioner's Appendix.

On November 18, 2024, the FRB sent CNC another request for additional information ("Second Request for Additional Information"). (PA 95-99). On December 5, 2024, CNC provided its response to the Second Request for Additional Information. (PA 104-144).

On February 12, 2025, CNC submitted a letter to the FRB noting that seventy (70) days had elapsed since CNC's December 5, 2024 submission, that it had heard nothing from FRB during that time, and thus CNC interpreted its Notice to have been deemed approved pursuant to 12 U.S.C. § 1843(j). (PA 146-147).

On February 24, 2025, the FRB sent CNC another request for additional information ("Third Request for Additional Information"), and contended that it had not yet received a "complete notice." (PA 149-153). On March 14, 2025, CNC submitted its response to the Third Request for Additional Information. (PA 165-184). On March 17, 2025, CNC submitted a corrected version and errata sheet for its response to the Third Request for Additional Information. (PA 185-186).

On April 11, 2025, the FRB sent CNC a fourth request for additional information ("Fourth Request for Additional Information"). (PA 188-189). On April 22, 2025, CNC submitted its response to the Fourth Request for Additional Information. (PA 191-199).

On June 20, 2025, the FRB sent a letter to CNC in which the FRB explained that 12 U.S.C. §§ 1843(j)(1)(C)(ii) and (j)(1)(E) "permit the Board to extend the processing period by 30 and 90 days, respectively, for a total extension of time of 120 days," and that "[t]he processing period for the notice has been extended for 120 days to facilitate further review of the statutory factors." (PA 204). The Board did not reference or acknowledge its previous letter of July 16, 2024, in which the Board exercised the same authority to extend its time to review the notice.

On October 17, 2025, the Board issued its Order denying CNC's request to offer the proposed Cash Guarantee Mortgage Program as a complementary activity. (PA 216-226) ("Order Disapproving Notice to Engage in Activities Complementary to a Financial Activity")).

### C. The Board's Rationale.

In its Order, the Board explained that "[i]t has long been impermissible for national banks to acquire real estate except in narrow circumstances," and noted that such a general prohibition was "intended to 'keep the capital of the banks flowing in the daily channels of commerce,' to prevent national banks from direct exposure to real estate, and to forestall the accumulation of significant real estate holdings by national banks." (PA 220-221) (quoting *National Bank v. Matthews*, 98 U.S. 621, 626

(1878)).  The Board then concluded that CNC's "proposal is inconsistent with the general prohibition on banking organizations investing in real estate and would involve [CNC] in precisely the type of real estate exposure that the prohibition is intended to prevent." (PA 222).

The Board noted that bank holding companies are permitted to acquire and hold title to real property in certain circumstances, but contrasted those circumstances as designed to reduce the banking organization's credit risks with what the FRB saw as the Program's effort to acquire real property when the organization declines to extend credit to a borrower.  (PA 222-223).

The Board acknowledged that CNC included limitations designed to "mitigate the safety-and-soundness risks to the organization," but ultimately was "unable to determine" that the Program did "not pose a substantial risk to the safety and soundness of financial institutions or the financial system generally, regardless of the proposed quantitative limit on the activity." (PA 223).  The Board wrote that "[p]ermitting FHCs to engage in the purchase and sale of real property as proposed by [CNC] arguably would leave them even more exposed to the types of risks that contributed to…previous banking system crises," and cited the savings and loan crisis of the 1980s, the failure of "a significant number of banks in the northeastern United States…in the early 1990s," and the financial crisis of 2007.

(PA 223-224). Based on that analysis, the Board found that the Program "would pose a substantial risk to the safety or soundness of Canandaigua Bank, depository institutions, and the financial system generally." (PA 224).

The Board "decline[d] to make a determination" regarding the other statutorily prescribed factors, including whether the proposed activity is "complementary to a financial activity within the meaning of the GLB Act," and whether the performance of the proposed activity:

> can reasonably be expected to produce benefits to the public, such as greater convenience, increased competition, or gains in efficiency, that outweigh possible adverse effects, such as undue concentration of resources, decreased or unfair competition, conflicts of interests, unsound banking practices, or risk to the stability of the United States banking or financial system.

(PA 224-225 (citing 12 U.S.C. § 1843(j)(2)(A) and 12 C.F.R. § 225.89(b)).

### D.     The Applicable Statutory and Regulatory Scheme.

Until 1999, a company that controlled a bank was generally limited to banking activities, and those activities that the FRB determined to be "so closely related to banking as to be a proper incident thereto." 12 U.S.C. § 1843(c)(8).

In 1999, Congress passed landmark legislation known as the GLB Act, which changed the law by, among other things, allowing banking, securities, and insurance companies to operate in affiliation with each other

16

under the newly created umbrella organizational form of financial holding companies ("FHCs"). Pub. L. No. 106-102, § 103, 113 Stat. 1338, 1342 (1999). The GLB Act significantly expanded the permissible activities contemplated in the BHC Act, and expressly permitted FHCs to engage not only in activities that are closely related to banking, but also in activities that are "complementary to a financial activity," so long as the proposed complementary activity does not pose a substantial risk to the safety or soundness of depository institutions or the financial system generally. 12 U.S.C. § 1843(k)(1)(B).[7]

The FRB has explained its view of the intended purpose of the GLB Act's complementary activity provision:

> The purpose of [the complementary activity] provision was to allow the Board to permit FHCs to engage in an activity that appears to be commercial rather than financial in nature, but that is meaningfully connected to a financial activity such that it complements the financial activity. In this way, FHCs would not be disadvantaged by market developments if commercial activities evolve into financial activities or nonbank competitors find innovative ways to combine financial and nonfinancial activities.

Complementary Activities, Merchant Banking Activities, and Other Activities of FHCs Related to Phys. Commodities, 79 Fed. Reg. 3329, 3330

---

[7] An FHC is defined as a bank holding company that is well managed and well capitalized. *See* 12 U.S.C. § 1843(l)(1)(C); 12 C.F.R. § 225.81.

17

(notice of proposed rulemaking Jan. 21, 2014); *see also The Royal Bank of Scotland Group plc*, 94 Fed. Res. Bull. C60 (2008).

Under 12 C.F.R. § 225.89, "[a] financial holding company that seeks to engage in…an activity that the financial holding company believes is complementary to a financial activity must obtain prior approval from the Board in accordance with section 4(j) of the BHC Act (12 U.S.C. § 1843(j))."

In evaluating a notice to engage in a complementary activity, the FRB:

> must consider whether: (1) The proposed activity is complementary to a financial activity; (2) The proposed activity would pose a substantial risk to the safety or soundness of depository institutions or the financial system generally; and (3) The proposal could be expected to produce benefits to the public that outweigh possible adverse effects.

12 C.F.R. § 225.89(b).

The Board is required to inform the FHC applicant "in writing of the Board's determination regarding the proposed activity within the period described in section [12 U.S.C. § 1843(j)]." 12 C.F.R. § 225.89(c).

18

## SUMMARY OF THE ARGUMENT

The Board's Order disapproving CNC's application to offer the modest Cash Guarantee Mortgage Program was seriously flawed. Two fundamental mistakes in the Board's analysis led it to the wrong determination. First, the FRB erroneously interpreted old, pre-GLB Act precedent applicable to national banks and bank holding companies in the pre-FHC world as imposing a *per se* prohibition on the purchase and sale of real property by FHCs. Second, in determining whether CNC's proposed Program would cause a substantial risk to the safety and soundness of CNC, depository institutions, or the financial system generally, the FRB stepped away from an analysis of CNC's Program and improperly considered the hypothetical impact of *other* imaginary proposals made by *other* unknown FHCs. The Board should have concluded that CNC's proposed Program—which was loaded with risk-mitigation safeguards and contemplated the purchase and prompt sale of only one or two homes per year—would not pose a substantial risk to the safety or soundness of CNC, depository institutions, or the financial system generally.

Similarly, although the Board declined to reach the other statutory elements, those are easily met here too. It is readily apparent that the Program would be "complementary to a financial activity" in that it is

19

designed to assist CNB Mortgage's lending business by attracting more mortgage-dependent home buyer customers and to respond to innovative attempts by nonbank lenders to command more of the first-time home mortgage market. It also is clear that the Program would likely produce public benefits that outweigh any adverse effects. Through the implementation of the Program, CNC can fulfill its commitment to its customers to offer competitive lending services and maintain its important role as a trusted, well-regulated financial services option for the local community. In contrast, the Program, as proposed, is not likely to have any adverse effects to the public.

In addition to its analytical missteps, the FRB failed to comply with the Congressionally imposed deadlines for reaching a disapproval determination. Under the applicable statute, CNC's Notice is "deemed to be approved" unless the FRB issues an order disapproving the activity within 60 days of receipt. While Congress allowed for the FRB to extend the 60-day deadline by up to an additional 120 days, here the FRB improperly sought, without CNC's consent, to avail itself of that option *twice*. The FRB also wrongly attempted to manipulate its timeline by making four separate requests for additional information—each of which became more redundant and sought increasingly less relevant information than the last. In all events,

20

the FRB's Order was untimely, and CNC's application should be "deemed approved" for this independently sufficient reason.

This Court should set aside the Board's Order and direct the Board to approve CNC's proposed Cash Guarantee Mortgage Program as "complementary to a financial activity" pursuant to 12 U.S.C. § 1843(k)(1)(B).

## STANDARD OF REVIEW

This Court reviews the Board's legal conclusions and application of the law *de novo*, including the Board's determination that its Order was timely. *See North Lawndale Economic Development Corp. v. Board of Governors of Federal Reserve System*, 553 F.2d 23, 27 (7th Cir. 1977) (per curiam). In interpreting the statutory commands applicable in this case, this Court owes no deference to the Board's determination. *See The Art & Antique Dealers League of Am., Inc. v. Seggos*, 121 F.4th 423, 435 (2d Cir. 2024) ("In the post-*Chevron* era, regardless of whether a statute is deemed to be ambiguous or unambiguous, interpretation of the statute is a question of law, and accordingly, it is the court, and not the administrative agency, that determines its meaning.") (citing *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024)).

This Court determines whether the Board's factual finding that the proposed Program "would pose a substantial risk to the safety or soundness of Canandaigua Bank, depository institutions, and the financial system generally" is supported by substantial evidence. 12 U.S.C. § 1848.

22

## ARGUMENT

I. **THE BOARD WRONGLY ADOPTED A PER SE APPROACH AGAINST AN FHC'S PURCHASE OF REAL PROPERTY THAT IS WHOLLY INCONSISTENT WITH THE GLB ACT'S COMPLEMENTARY ACTIVITIES FRAMEWORK.**

The GLB Act amended the BHC Act to account for a number of changes in the financial marketplace.  Prior to the GLB Act and the creation of FHCs, a bank holding company could only engage in nonbanking activity where the FRB determined the proposed activity was "so closely related to banking or managing or controlling banks as to be a proper incident thereto." 12 U.S.C. § 1843(c)(8).  The GLB Act expanded permissible nonbanking activities for certain bank holding companies, i.e., FHCs, to allow those activities that are "complementary to a financial activity and do[] not pose a substantial risk to the safety or soundness of depository institutions or the financial system generally."  12 U.S.C. § 1843(k)(1)(B).  The FRB and the Department of Treasury have long acknowledged that the GLB Act "represents a significant expansion of the 'closely related to banking' standard that the Board previously applied in determining the permissibility of activities for bank holding companies."  Financial Subsidiaries, 66 Fed. Reg. 307, 308 (proposed Jan. 3, 2001)(to be codified at 12 CFR pt. 225). Whereas prior to the GLB Act's passage, "the law directed the Board to consider whether banks engaged in the activity, but did not explicitly

23

authorize the Board to consider whether other financial service providers engaged in the activity," the GLB Act "change[d] [the] law" to "significant[ly] expan[d] the Board's capacity to consider the competitive realities of the U.S. financial marketplace in determining the permissibility of activities for FHCs." *Id.* at 309-310.

Despite this modernization of the law, here the FRB suggested that pre-GLB Act precedent mandated its disapproval of the proposed Program because "[b]ank holding companies are generally prohibited from investing in real property." (PA 220).[8]  The FRB cited two pre-GLB Act decisions as support for its *per se* approach: (i) the Supreme Court's 1878 decision in *National Bank v. Matthews*, 98 U.S. 621 (1878), and (ii) the FRB's 1972 Order in *UB Financial Corp.*, 58 Fed. Res. Bull. 428 (1972).  (PA 221). Neither of these timeworn authorities is directly applicable to the FRB's evaluation of the Program as a complementary activity proposed by CNC as an FHC.

---

[8] The FRB did not explain why it viewed CNC's limited proposed Program to constitute "investing in real estate."  Nowhere in its Order did the FRB acknowledge that CNC expressly disavowed any intention to "profit" from the disposition of any property it obtained under the Program or that CNC anticipated only purchasing "at most, two homes per year" under the Program.  (PA 82, 91).

24

The *Matthews* case, decided by the Supreme Court 148 years ago, addressed the limited instances in which national banks were statutorily allowed to purchase, hold, and convey real estate. *See Matthews*, 98 U.S. at 625.[9] The *Matthews* Court described the "object of the restrictions" on national banking associations holding real property as "threefold": "It was to keep the capital of the banks flowing in the daily channels of commerce; to deter them from embarking in hazardous real-estate speculations; and to prevent the accumulation of large masses of such property in their hands, to be held, as it were, in mortmain." 98 U.S. at 626.

None of those "threefold" objectives are implicated by CNC's proposed Program. The Program would not stop the flow of CNC's subsidiary bank's capital into the channels of commerce, does not implicate "hazardous real-estate speculations," and would not result in "the accumulation of large masses of" real property to be held indefinitely. Moreover, CNC is not a national bank subject to 12 U.S.C. § 29 at all.[10]

Similarly inapposite is the Board's 1972 decision in *UB Financial Corp.*, which was based on the "closely related to banking" standard then

---

[9] The *Matthews* Court reviewed Section 5137 of the National Bank Act, which is now codified at 12 U.S.C. § 29.

[10] National Banks are overseen by the Office of the Comptroller of the Currency ("OCC"), not the FRB.

applicable to bank holding companies. *See* 58 Fed. Res. Bull. 428. Indeed, the Board itself previously recognized as much. In 2001, the National Association of Realtors ("NAR") suggested it would be improper to permit FHCs to provide real estate brokerage services because of the Board's 1972 order prohibiting bank holding companies from acting as a real estate broker. Back in 2001, the FRB properly rejected the NAR's rationale because it failed to account for the modern regulatory framework ushered in by the GLB Act:

> The Board's 1972 decision on real estate brokerage was made pursuant to the former 'closely related to banking' standard; the GLB Act now authorizes the Board to approve any activity that is 'financial in nature' or 'incidental to a financial activity.' The plain meaning of and legislative history behind the 'financial' and 'incidental to financial' suggests that Congress intended the new standards to be significantly broader than the old 'closely related to banking' test. Furthermore, the financial services environment has changed significantly in the past 30 years, and what may have been an inappropriate activity for bank holding companies in the early 1970s may be appropriate for the diversified FHCs of the early 21st century.

Financial Subsidiaries, 66 Fed. Reg. at 311. In other words, the FRB recognized in 2001 that the GLB Act left behind the FRB's decisions from the 1970s. The GLB Act requires the FRB to engage in a more sophisticated review of an FHC's application to engage in complementary activity than simply applying old, pre-GLB Act precedent concerning bank holding companies and the "closely related to banking" test. Now more than 50

26

years removed from its 1972 *UB Financial Corp.* decision, the FRB

curiously advances in its Order the same unpersuasive argument that the

NAR made previously and that the FRB then soundly rejected.  The FRB

had it right in 2001.  Congress intended for the GLB Act to broaden the

types of activities that FHCs could engage in to meet the times, and the pre-

GLB Act decisions made under different statutory standards for banks

should no longer dictate the FRB's exercise of its discretion.  That intent

was evident to the FRB in 2001, and despite the passage of 25 years,

Congress's intent could not have changed.

Compounding its mistaken reliance on pre-GLB Act precedent, the

FRB also cited to 12 U.S.C. § 1843(a)(2) for its conclusion that the

"general[] prohibit[ion]" on bank holding companies investing in real estate

doomed CNC's application.  (PA 220-221).[11]  That was error because CNC

submitted its application as an FHC seeking approval under the

complementary activities provision in Section 1843(k)(1)(B), which

expressly provides that the Board make determinations concerning

---

[11] As support for its contention that 12 U.S.C. § 1843(a) generally prohibits
bank holding companies from investing in real estate, the FRB described
Section 1843(a) as "providing generally that a bank holding company may
not engage in any activity, directly or indirectly, except for (i) those of
banking or managing or controlling banks and other authorized subsidiaries,
(ii) servicing activities, and (iii) activities permitted under other provisions
of [12 U.S.C. § 1843]."  (PA 220, n.16).

27

"complementary" activities "[n]otwithstanding subsection (a)." Congress thus insisted that the FRB not simply default to disapproving complementary activity applications by FHCs on the basis that the proposed activity might not be allowed under Section 1843(a). The whole point of Section 1843(k)(1)(B)'s complementary activity authority is to permit FHCs to engage in activities that bank holding companies are not otherwise allowed to engage in under the limitations set forth in 12 U.S.C. § 1843(a)(2).

The FRB's flawed rationale was further exposed when it commented that "Congress has not amended the prohibition against bank holding companies investing in real estate," notwithstanding the GLB Act's expansion of permissible activities by FHCs. (PA 221-222). The FRB's interpretation of Congress's silence ignores altogether the revolutionary purpose and effect of the GLB Act. Indeed, while 12 U.S.C. § 1843(a)(2) was not formally amended, Congress's creation of FHCs and introduction of an expanded category of nonbanking activities—complementary activities— in which they may engage under 12 U.S.C. § 1843(k)(1)(B)— "notwithstanding subsection (a)"—is a *de facto* amendment to the strict limitations of 12 U.S.C. § 1843(a)(2).

The FRB then sought to buttress its invention of a *per se* bar to FHCs purchasing real estate by noting that "Congress, since passage of the GLB

28

Act, has curbed the Board's authority to permit FHCs to engage in real estate-related activities," citing the Note to 12 U.S.C. § 1843 that now forbids the Board from determining that real estate brokerage activity or real estate management activity is complementary to any financial activity. (PA 222, n.23). As the FRB quickly admitted, however, CNC's "proposed cash guarantee mortgage program" *does not* "constitute[] real estate brokerage activity or real estate management activity." *Id*. And thus, the FRB's argument in this regard just drives home that Congress chose *not* to impose any similar bar on an FHC's limited purchase of real estate or implementation of a cash guarantee mortgage program as a complementary activity under Section 1843(k)(1)(B).

In short, the FRB's disapproval of the proposed Program was wholly inconsistent with Congress's intent in enacting the GLB Act. Sponsors of the GLB Act were clear that the legislation was designed to remove constraints and allow the various types of financial service providers "to compete head-to-head with a complete range of products and services." 145 Cong. Rec. H11527 (daily ed. Nov. 4, 1999)(statement of Rep. James A. Leach). In addition to fostering greater competition in product and service offerings, the GLB Act particularly sought to bolster smaller, community institutions like CNC. Sponsor Representative Leach expressly noted that:

> If there is an institutional tilt to the balanced approach taken in this bill, it is to and for smaller institutions. In a David and Goliath competitive world, this legislation is the community bankers' and independent insurance agents' slingshot. They and the customers they serve will be empowered to a greater extent than under the status quo or any alternative modernization approach.

*Id.* In blindly adhering to outdated, previously rejected precedent and inapplicable statutory limitations, the FRB thwarted Congress's intent and denied CNC an opportunity to compete in an evolving financial marketplace.

## II. THERE IS NO SUPPORT, LET ALONE SUBSTANTIAL EVIDENCE, FOR THE BOARD'S FINDING THAT CNC'S PROPOSED CASH GUARANTEE MORTGAGE PROGRAM POSES A SUBSTANTIAL RISK TO THE SAFETY OR SOUNDNESS OF DEPOSITORY INSTITUTIONS OR THE FINANCIAL SYSTEM GENERALLY.

### A. The Board Did Not Meaningfully Engage in a Safety and Soundness Analysis.

In its Order, the Board found that "the proposed cash mortgage guarantee program would pose a substantial risk to the safety or soundness of Canandaigua Bank, depository institutions, and the financial system generally." (PA 224). Because it was fixated on its perception of "the general prohibition on banking organizations" from investing in, purchasing, and holding real property as articulated in pre-1999 precedent, the FRB never engaged in a genuine safety and soundness risk analysis, as required by 12 U.S.C. § 1843. (PA 222). The FRB's analysis was little more than *ipse dixit*: "Under the proposal, [CNC] would purchase, hold, and ultimately

30

dispose of real property, subjecting it and its subsidiaries to the considerable safety-and-soundness risks inherent in investing in real estate." *Id.* The FRB never attempted to explain *why* there were "considerable" risks to safety and soundness that were "inherent" in CNC's proposed Program, or even *what* those risks might be. Instead, the FRB's Order can only be read to suggest that an FHC's purchase and holding of real property always—automatically—presents a *substantial* risk to the safety or soundness of depository institutions and the financial system generally, regardless of the scope or limitations on such activity. Given the statutorily permissible instances in which even national banking associations are permitted to purchase, hold, and convey real estate under 12 U.S.C. § 29—such as in the OREO category—the FRB's premise is plainly wrong.

The Board's approach to CNC's application also was at odds with its prior consideration of FHC requests to engage in complementary activities. In those prior orders, the FRB conducted a more robust analysis and approved FHC applications. For example, the FRB has authorized certain FHCs to make and take delivery of physical commodities to settle commodities derivatives transactions on the basis that such transactions are complementary to a financial activity. *See*, *e.g.*, *Citigroup Inc.*, 89 Fed. Res. Bull. 508 (2003); *UBS AG*, 90 Fed. Res. Bull. 215 (2004); *Barclays Bank*

31

*PLC*, 90 Fed. Res. Bull. 511 (2004); *Deutsche Bank AG*, 92 Fed. Res. Bull. C54 (2006); *JPMorgan Chase & Co.*, 92 Fed. Res. Bull. C57 (2006); *Société Générale*, 92 Fed. Res. Bull. C113 (2006).[12]

In its order permitting Citigroup Inc.'s application to engage in such complementary activity, the FRB explained that authorizing the activity would allow Citigroup to compete with the offerings of other nonbank financial intermediaries, and would "benefit Citigroup's customers by enhancing the ability of Citigroup to provide efficiently a full range of commodity-related services." 89 Fed. Res. Bull. at 511. The FRB also conditioned its approval of Citigroup's proposal on the requirement that "the market value of commodities held by Citigroup as a result of the Commodity Trading Activities must not exceed 5 percent of Citigroup's consolidated tier 1 capital." 89 Fed. Res. Bull. at 510-11. The FRB concluded that, as limited, the proposed activity "does not pose a substantial risk to the safety and soundness of depository institutions or the financial system generally and can reasonably be expected to produce benefits to the public that outweigh any potential adverse effects." 89 Fed. Res. Bull at 511.

---

[12] The FRB considers applications by financial holding companies to engage in complementary activities "on a case-by-case basis." 145 Cong. Rec. at H11529.

The FRB also has approved proposals to engage in energy management services and in energy tolling as complementary activities. *See*, *e.g.*, *Fortis S.A./N.V. et al.*, 94 Fed. Res. Bull. C20 (2008); *The Royal Bank of Scotland Group plc*, 94 Fed. Res. Bull. C60 (2008). In granting those approvals, the FRB considered, among other things, that non-FHC competitors of the applicant FHC were engaging in similar activities. *Fortis S.A./N.V. et al.*, 94 Fed. Res. Bull. at C22; *The Royal Bank of Scotland Group plc*, 94 Fed. Res. Bull. at C65. The FRB also imposed limitations on the financial risk that the applicant could take on with these complementary activities. *Id.* In finding that the proposed complementary activities did not pose a substantial risk to the safety and soundness of depository institutions or the financial system generally, the FRB focused its analysis on the applicant's proposal, and credited the applicant as having the "expertise and internal controls necessary to effectively integrate the risk management of those activities into its overall risk-management framework." *Royal Bank of Scotland Group plc*, 94 Fed. Res. Bull. at C66. The FRB refrained from speculating about how other FHCs might fare in implementing similar programs. Nor did the FRB weigh hypothetical risks posed by the broad adoption of the same activities by other FHCs not at issue.

33

The FRB also approved Wellpoint's proposed disease management and mail-order pharmacy program as an acceptable complementary activity. *Wellpoint, Inc.*, 93 Fed. Res. Bull. C133, C135 (2007). As with its other approvals of complementary activities, the FRB undertook a full analysis of the statutory elements under 12 U.S.C. § 1843(k)(1)(B). The FRB noted that large health insurance competitors of Wellpoint engage in similar activities, emphasized that Wellpoint's disease management and mail-order pharmacy activities "in the aggregate account for less than 1 percent of Wellpoint's consolidated total assets and less than 4 percent of Wellpoint's consolidated total annual revenues," and conditioned its approval by capping the proposed activities at no more than 2 percent of Wellpoint's consolidated total assets and 5 percent of its consolidated total annual revenues. *Id.* at C135.

As these prior FRB orders illustrate, the FRB has regularly approved a variety of complementary activities by FHCs and has consistently engaged in far more meaningful safety and soundness analyses than it did with CNC's application. Further, these prior orders establish that the FRB has traditionally recognized that imposing reasonable limitations on the scope or scale of a proposed complementary activity can be an effective control to mitigate potential risks. Applying those same principles to CNC's application would produce an approval determination. The FRB's order

denying approval of CNC's Program, however, abandoned its responsibility to conduct a meaningful safety and soundness analysis, dismissed CNC's carefully crafted risk-mitigation measures, and reached a disapproval determination based on nothing more than the Program's connection to real estate. There was no evidence to support the Board's conclusion.

### B. The Board Noted but Disregarded the Critical Safeguards Built into CNC's Proposed Program.

As noted, CNC proposed a number of safeguards that would be central features of its Cash Guarantee Mortgage Program. First, CNC would seek to dispose of any property it acquired through the program as quickly as possible, and to hold title to any property for no longer than two years.[13] Second, CNC would cap its aggregate real estate holdings purchased under the Program at $5,000,000 at any time (which is only 0.1% of CNC's total assets). Third, CNC explained that CNB Mortgage's historical rate of declining final mortgage approval after a pre-approval is just 0.67%, and thus it expected to purchase under the Program "at most, two homes per year" (PA 82). CNC's expected purchase volume is substantiated by the experience of its nonbank mortgage lending competitor Premium, which

---

[13] This limitation is stricter than the regulations concerning bank holding companies' disposition of title to real property that they obtain through foreclosure. *See* 12 C.F.R. Part 225.22(d)(1) (allowing for FRB extensions up to a total of 10 years).

35

processed some 1,378 cash guarantee first mortgages over the first four years of its program with only five (5) instances of having to fulfill its purchase obligations. (PA 120, 139).

In its Order, the Board noted some of the "limits" CNC proposed for the Program, but minimized their importance. (PA 219). The Board concluded that "the BHC Act requires the Board to consider the safety-and-soundness risks of a proposed activity to 'depository institutions or the financial system generally,' not simply the risks that may arise for a particular notificant." (PA 223). The Board then concocted its own hypothetical to analyze instead of evaluating the Program at issue. The Board imagined that if *all* FHCs were "to engage in the purchase and sale of real property as proposed by" CNC—and presumably without the same proposed safeguards—then those other FHCs might, "arguably," be "even more exposed to the types of risks that contributed to … previous banking system crises." (PA 224).

To support its choice to broaden its assessment beyond CNC's modest proposal, the FRB cited to its prior order in *Wellpoint, Inc.*, 93 Fed. Res. Bull. at C135. But in *Wellpoint*, the FRB was clear-eyed that the proper analysis required it to consider the specific impact that *Wellpoint's* proposed disease management and mail-order pharmacy activities would have on the

financial system as a whole. There, the FRB did not seek to assess the risk if all FHCs implemented similar programs. Indeed, Petitioner is unaware of any prior orders in which the FRB evaluated a proposed complementary activity by forecasting its adoption by all, most, or even some other FHCs. With CNC, however, the FRB conflated its charge to analyze the risk of the specific proposed complementary activity on the financial system generally, with one that hypothesizes the potential risk if the whole financial system were to undertake similar proposed complementary activity. That was error.

In addition to making that analytical mistake, the FRB's determination was not supported by substantial evidence. Indeed, the limitations on CNC's proposed Program ensure that it would pose no risk to CNC, depository institutions, or the financial system generally. In exchange for offering its mortgage-dependent residential home buyer customers an attractive basis to compete for home ownership, CNC might have to purchase a couple of residences per year and promptly sell them thereafter. The Board's conclusion that the Program poses a *substantial* risk to the safety and soundness of Canandaigua Bank, depository institutions, and the financial system generally was utterly baseless.

37

III.   **THIS COURT CAN AND SHOULD CONCLUDE THAT CNC'S PROPOSED PROGRAM MEETS THE OTHER STATUTORY ELEMENTS AND ORDER THE BOARD TO APPROVE THE PROGRAM.**

   A.   **CNC's Proposed Cash Guarantee Mortgage Program "Is Complementary to a Financial Activity."**

In its Order, the Board recognized that it was required to consider whether CNC's proposed activity was "complementary to a financial activity," and nowhere suggested that the Cash Guarantee Mortgage Program is not complementary to a financial activity. (PA 217). Nevertheless, the Board expressly "decline[d]" to determine whether the Program was complementary to a financial activity. (PA 225).[14]

A complementary activity is one that may "appear[] to be commercial rather than financial in nature but that is meaningfully connected to a financial activity such that it complements the financial activity." *Citigroup, Inc.*, 89 Fed. Res. Bull. 508 (2003); *see also* (PA 217). Here, the Program is complementary to the lending services provided by CNC's subsidiary, CNB Mortgage. Lending is a statutorily enumerated activity expressly considered to be financial in nature. 12 U.S.C. § 1843(k)(4)(A). As a community-based institution, CNC and CNB Mortgage are tasked with meeting a basic

_____

[14] 12 U.S.C. § 1843(k)(1) provides, in pertinent part, that an FHC "may engage in any activity . . . that the Board . . . determines . . . is complementary to a financial activity and does not pose a substantial risk to the safety or soundness of depository institutions or the financial system generally."

38

financial need for that community—the promotion of home ownership through originations and mortgages for its customers. To accomplish this, CNC and CNB Mortgage must be able to offer competitive mortgage products. CNC's proposed Cash Guarantee Mortgage Program is "meaningfully connected to" CNB Mortgage's provision of lending services to mortgage-dependent residential home buyers who are seeking to compete more effectively with other buyers' all-cash offers. By offering the proposed Program, CNC expects that CNB Mortgage will close more first-time home buyer mortgages and compete more effectively with nonbank lenders that are offering similar programs. *See*, *e.g.*, Complementary Activities, Merchant Banking Activities, and Other Activities of FHCs Related to Phys. Commodities, 79 Fed. Reg. at 3330 (purpose of the complementary activity provision is to help ensure "FHCs would not be disadvantaged by market developments if commercial activities evolve into financial activities or nonbank competitors find innovative ways to combine financial and nonfinancial activities").

Notably, it is already recognized under regulations applicable to bank holding companies that a number of lending-related activities meet the higher "closely related to banking" standard, including real estate appraising, real estate settlement servicing, and collecting overdue accounts receivables,

39

among others.  *See*, *e.g.*, 12 C.F.R. Part 225.28(b)(2)(i), (iv), and (viii).

Whether or not offering a cash guarantee mortgage program falls within the

"closely related to banking" standard, it easily meets the lower

"complementary to a financial activity" standard.

> **B.     CNC's Proposed Cash Guarantee Mortgage Program
> Could Be Expected to Produce Benefits to the Public That
> Outweigh Possible Adverse Effects.**

The law "require[s]" the FRB to engage in a balancing test—weighing

the potential benefits and the possible adverse effects—when considering an

FHC's proposal to engage in a complementary activity.  (PA 217).

Specifically, the FRB must "consider . . . whether performance of the

activity by the FHC can reasonably be expected to produce public benefits,

such as greater convenience, increased competition, or gains in efficiency,

that outweigh possible adverse effects, such as undue concentration of

resources, decreased or unfair competition, conflicts of interest, unsound

banking practices, or risk to the stability of the United States banking or

financial system."  12 U.S.C. § 1843(j)(2)(A).  Although the FRB

acknowledged this statutory duty in its Order denying CNC's proposed

Program, it nevertheless expressly "decline[d] to make a determination" on

these "other statutory elements," while vaguely offering its "belie[f]" that

"certain aspects" of CNC's proposal "raise concerns."  (PA 225).

CNC established several public benefits of its proposed Cash Guarantee Mortgage Program, including (i) its customers would be better able to compete with other potential home buyers making all-cash offers; (ii) CNB Mortgage would be better able to compete with nonbank lenders who were already offering such cash guarantee mortgage products in the Greater Rochester region; and (iii) providing borrowers with a competitive lending option at a regulated and respected community bank, which can help foster a long-term financial relationship that is the backbone of community-based banking.  The FRB did not dispute that these benefits could be expected.[15] Instead, the FRB concluded without discussion that "it is not clear that these asserted benefits outweigh the possible adverse effects of the proposed activity."  (PA 225).

The "possible adverse effects" the FRB identified were "the unsound banking practices involved in real estate investment, as well as the negative financial impact that could fall on potential customers who lose their earnest

---

[15] Indeed, the FRB has noted the importance of renewed bank participation in the mortgage market and recognized the "structural advantages" that banks have over nonbank lenders in servicing mortgages. *See*, *e.g.*, Michelle Bowman, Vice Chair for Supervision, Fed. Rsrv. Bd., Revitalizing Bank Mortgage Lending, One Step with Basel (Feb. 16, 2026) Speech at the Am. Bankers Ass'n 2026 Conf. for Cmty. Bankers, https://www.federalreserve.gov/newsevents/speech/bowman20260216a.htm [https://perma.cc/AA9W-YE5N].

41

money deposit under the cash guarantee mortgage program." (PA 225). Neither of these "possible adverse effects" that the FRB found to "raise concerns" hold up. First, characterizing CNC's proposed Program as "real estate investment" illustrates the FRB's fundamental misunderstanding of the Program and is not consistent with the record. CNC reasonably expects to purchase one or two homes per year, and promptly sell them. It did not propose to engage in speculative, real estate investment activity. The FRB never explained how CNC's potential purchase and sale of a couple of homes per year to satisfy its obligations under the Program would harm the public. Moreover, the FRB gave no explanation for how the purchase and sale of residential real estate, in these highly limited circumstances, risks the stability of the financial system generally. Nor is the cited "negative financial impact" of one or two potential home buyers losing some portion of their 15% EMD the type of adverse effect that Congress was concerned about. *See* 12 U.S.C. § 1843(j) (*e.g.*, undue concentration of resources, decreased or unfair competition, conflicts of interest, unsound banking practices, or risk to the stability of the United States banking or financial system).

In contrast, the expected benefits to the public cited by CNC fall squarely within those that Congress highlighted in the statute. *Id.* (greater

42

convenience, increased competition, or gains in efficiency). The Program would permit CNC to meet the competitive demands in its geographic area by offering its community banking customers a mortgage product that will better position them for home ownership opportunities. These are among the primary aims of the GLB Act as articulated by its sponsor, Representative Leach:

> Banks which stick with offering the same old accounts and services in the same old ways will find their viability threatened. Those that innovate and adapt under the provisions of this bill will be extraordinarily well positioned to grow and serve their customer base.
>
> . . .
>
> What the new flexibility provided community banks means is that consumers and small businesses in the most rural parts of America will be provided access to the most up-to-date, sophisticated financial products in the world, delivered by people they know and trust.

145 Cong. Rec. at H11528-29 (further, Rep. Leach confirmed "the framework of this bill assures that community banks have the tools to remain competitive").

### C.   This Court Has Authority to Reach These Issues.

Congress expressly intended to impose a check on the FRB's exercise of its powers by providing for direct judicial review in the United States Courts of Appeals, and authorizing this Court "to affirm, set aside, or modify" any FRB order and to require the FRB "to take such action . . . as

43

the court deems proper." 12 U.S.C. § 1848. In this case, it is respectfully submitted that this Court can and should weigh in on the statutory elements that the FRB refused to reach. These other statutory considerations are not complicated nor controversial. And this Court has the same record available to it as was presented to the FRB. Further delaying approval of CNC's proposed Program will only place CNC even more behind its nonbanking lender competitors and further erode its share of the residential first mortgage market. *See*, *e.g.*, *Guertin v. United States*, 743 F.3d 382, 388 (2d Cir. 2014) ("This is one of the unusual circumstances where remand to the agency for further proceedings is not necessary because there is compelling evidence in the record…").

## IV. CNC's Notice Should Be "Deemed Approved" Because the Board is Not Permitted to Exercise Its Limited Right to Grant Itself Extensions More Than Once.

The Bank Holding Company Act imposes clear time limits for the Board to render a determination on an application like CNC's. The applicable procedures are set forth in 18 U.S.C. § 1843(j)(1).

First, CNC is not allowed to engage in any complementary financial activity, without first providing the Board with written notice of the proposed activity "at least 60 days before the . . . activity is proposed to . . . commence." 12 U.S.C. 1843(j)(1)(A). Here, CNC followed this directive

44

by submitting its Notice requesting approval of its Cash Guarantee Mortgage Program on May 17, 2024.[16]

Any notice shall be "deemed to be approved by the Board unless, before the end of the 60-day period beginning on the date the Board receives a complete notice under subparagraph (A), the Board issues an order disapproving the . . . activity and setting forth the reasons for disapproval." 12 U.S.C. § 1843(j)(1)(C)(i).  The statute allows the Board to extend the 60-day period for an additional 30 days, and further provides for an additional 90-day extension for certain notices including to engage in "complementary activity" under 12 U.S.C. § 1843(k)(1)(B).  *See* 12 U.S.C. § 1843(j)(1)(C)(ii) and (j)(1)(E).  If the Board does not timely act, the notice is "deemed to be approved."  12 U.S.C. § 1843(j)(1)(C)(i).

In other words, with respect to CNC's application, the Board could extend the generally applicable 60-day review period by up to 120 more days, by availing itself of both the 30-day extension pursuant to Section 1843(j)(1)(C)(ii) and the 90-day extension pursuant to Section 1843(j)(1)(E).

---

[16] As noted, CNC later re-submitted its May 17, 2024 Notice with portions of Schedule 1 redacted for confidentiality reasons.  *See* note 6, *supra*.  No substantive modifications were made to the Notice.  (PA 27).

Here, the Board sought to exercise both the 30-day and 90-day extension periods, but wrongly did so *twice*.

On July 16, 2024, the Board notified CNC that the Notice "cannot be acted upon within 60 calendar days of the acceptance date," that "[t]he 60th day after the filing was received is July 16, 2024," and thus "[t]he processing period for the application has been extended to facilitate further review of the statutory factors." (PA 26) (citing 12 U.S.C. § 1843(j)(1)(E)). The Board's July 16, 2024 correspondence is significant. At that time, the Board confirmed that it was exercising its extension rights, which means that it was acknowledging that it had a "complete notice" for purposes of Section 1843(j)(1)(B) as of May 17, 2024.

Following the Board's July 16, 2024 letter, CNC and the Board engaged in correspondence regarding the confidentiality of portions of one of the attachments (Schedule 1) to CNC's Notice, but no substantive modifications were made to the Notice and no supplemental information was provided. (PA 27-59, 67-69).

Beginning with an October 3, 2024 letter, the Board and its agents with the Federal Reserve Bank of New York then proceeded to make four separate requests for additional information from CNC. CNC responded to each request by first noting that it had previously provided the requested

information, and then expanding on its prior submissions where applicable. CNC never agreed that its responses to the requests for additional information should be deemed to have re-started the Board's time for rendering a decision. In its March 14, 2025 Response to the Third Request for Additional Information, CNC included a full reservation of rights, reiterated its position that the Board had previously admitted that the Notice was complete as of May 17, 2024, noted for a second time that its voluminous December 5, 2024 Response to the Second Request for Additional Information sat with the Board for 70 days without any communication, and that in a worst case situation its March 14, 2025 response must be deemed to make its application complete. (PA 165-166).

The Board, however, issued an unsigned fourth request for additional information on April 11, 2025, posing four further questions. (PA 188-189). On April 22, 2025, CNC again provided a good-faith response. (PA 190-199).

On June 20, 2025, the Board sent another letter to CNC providing notice that the Board was again "extend[ing] the processing period by 30 and 90 days, respectively, for a total extension of time of 120 days," pursuant to 12 U.S.C. § 1843(j)(1)(C)(ii) and 12 U.S.C. § 1843(j)(1)(E). (PA 204). Nowhere in the June 30, 2025 correspondence did the FRB state

when it believed to have received a complete notice from CNC, nor was there any reference to the Board's prior July 16, 2024 extension notice.

The FRB finally issued its disapproval decision on October 17, 2025—119 days after the FRB's June 20, 2025 letter, and 518 days after CNC submitted its May 17, 2024 Notice. At the end of its October 17, 2025 Order, in a footnote, the FRB addressed CNC's argument that the FRB's time to take action on the Notice had expired. The FRB stated that it "believes that it has acted within the timelines specified for action in section 4(j) of the BHC Act." (PA 226, n.33). The FRB added that it "considers the Notice complete as of April 22, 2025," which started the 60-day clock, and, after taking into account the extensions that the FRB purported to exercise on June 20, 2025, made the October 17, 2025 determination to disapprove the proposal timely. The FRB did not reference CNC's initial May 17, 2024 Notice filing date, nor did it acknowledge its own July 16, 2024 letter in which it first exercised its extension rights.

Notably, in its October 17, 2025 Order, the FRB's description of CNC's proposed Program and its assessment of the applicable statutory factors is based almost entirely on information that CNC provided in its May 17, 2024 Notice, and there is no reference to any material that was first

48

provided to the FRB any later than CNC's December 5, 2024 Response to the Second Request for Additional Information.[17]

The FRB took longer to issue its disapproval than is statutorily allowed. Other courts have held the FRB to these strict time limits in the past and, on direct appeal under 12 U.S.C. § 1848, have set aside FRB orders and deemed applications to be granted. *See*, *e.g.*, *North Lawndale Economic Development Corp. v. Board of Governors of Federal Reserve System*, 553 F.2d 23, 27 (7th Cir. 1977) (per curiam) (rejecting the FRB's argument that the clock was re-started based on a meeting with officers of the applicant that involved a "discussion concerning facts already in the record" and holding that the FRB failed to comply with applicable 91-day deadline). Here, by exercising its extension rights under 12 U.S.C. § 1843(j)(1)(E) on July 16, 2024, the FRB had already informed CNC that the Notice was complete as of May 17, 2024. Thereafter, the FRB manufactured further extensions for itself by issuing repeated, and increasingly redundant or irrelevant, requests for additional information. This Court has previously cautioned the FRB not to manipulate the date on which it considers a notice to be "complete." *See*, *e.g.*, *Citicorp v. Board of Governors of Federal*

---

[17] In its Response to the Second Request for Additional Information, CNC committed to requiring that any property that it owns under the Program be disposed of within two years. (PA 113).

*Reserve System*, 589 F.2d 1182, 1188 (2d Cir. 1979) ("we think the Board's discretion to determine the start of the [then-applicable] 91-day time period is limited by the implicit statutory requirement that these activities be accomplished with reasonable promptness").  As the Court noted in *Citicorp*, where it analyzed the 91-day time limit applicable in that case, "[t]he purpose of the 91-day rule was to counteract the dilatoriness of the Fed.  The rule would lose much of its effectiveness in serving this purpose if the Fed had discretion to determine when the 91-day period begins to run." *Id.* at 1187 (quoting *Central Wisconsin Bankshares, Inc. v. Board of Governors of Federal Reserve System,* 583 F.2d 294, 296 (7th Cir. 1978)).

Here, the FRB engaged in precisely the type of dilatory conduct that Congress sought to guard against by enacting an explicit deadline.  The FRB improperly tried to extend its time by (i) wrongly availing itself of statutory extensions more than once, and (ii) issuing repeated requests for additional information that were increasingly redundant and not relevant to its determination.  This Court should now set aside the Board's disapproval as untimely and deem CNC's Notice to be approved under 12 U.S.C. § 1843(j)(1)(C)(i).

50

**CONCLUSION**

For the foregoing reasons, the FRB's October 17, 2025 Order should

be set aside, and the FRB should be directed to approve CNC's proposed

Cash Guarantee Mortgage Program as a complementary activity.


April 21, 2026

<u>/s/ Jeffrey A. Wadsworth</u>
Jeffrey A. Wadsworth
Laura A. Higgins
HARTER SECREST & EMERY LLP
1600 Bausch & Lomb Place
Rochester, New York 14604-2711
Tel:   (585) 232-6500
Email:  jwadsworth@hselaw.com
            lhiggins@hselaw.com


*Counsel for Petitioner Canandaigua National Corporation*

51

# CERTIFICATE OF COMPLIANCE

I certify that, pursuant to Fed. R. App. P. 32(a)(7)(B), the attached brief is proportionately spaced, has a typeface of 14 points, and contains 10,522 words.  This word count excludes the table of contents, table of authorities, and signatures and certificates of counsel.

/s/ Jeffrey A. Wadsworth
Jeffrey A. Wadsworth, Esq.
HARTER SECREST & EMERY LLP
1600 Bausch & Lomb Place
Rochester, New York 14604-2711
Tel:    (585) 232-6500
Fax:    (585) 232-2152
Email: jwadsworth@hselaw.com

April 21, 2026