# 25-3083

IN THE

## United States Court of Appeals for the Second Circuit

CANANDAIGUA NATIONAL CORPORATION,

*Petitioner*,

v.

BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM,

*Respondent*.

On Petition for Review from an Order of the
Board of Governors of the Federal Reserve System,
Agency No. 2025-17

**BRIEF OF AMICI CURIAE THE BANK POLICY INSTITUTE, AMERICAN BANKERS ASSOCIATION, NEW YORK BANKERS ASSOCIATION, AND INDEPENDENT COMMUNITY BANKERS OF AMERICA IN SUPPORT OF NEITHER PARTY AND REMAND**

Gregg L. Rozansky
Tabitha Edgens
THE BANK POLICY INSTITUTE
600 Thirteenth Street, NW
Suite 400
Washington, DC 20005
(202) 289-4322

Kevin F. King
Randy Benjenk
Matthew C. Quallen
COVINGTON & BURLING LLP
One City Center
850 Tenth Street NW
Washington, DC 20001
(202) 662-5488

Meghann E. Donahue
COVINGTON & BURLING LLP
30 Hudson Yards
New York, NY 10001

*Counsel for Amici Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rules of Appellate Procedure 26.1(a) and 29(a)(4)(A), amicus Bank Policy Institute states that it has no parent corporation and no publicly held corporation owns ten percent or more of its stock.

Amicus American Bankers Association states that it has no parent corporation and no publicly held corporation owns ten percent or more of its stock.

Amicus New York Bankers Association states that it has no parent corporation and no publicly held corporation owns ten percent or more of its stock.

Amicus Independent Community Bankers of America states that it has no parent corporation and no publicly held corporation owns ten percent or more of its stock.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................................ i

TABLE OF AUTHORITIES................................................................................ iii

INTEREST OF AMICI CURIAE ......................................................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ...................................... 4

ARGUMENT ...................................................................................................... 6

I.      The Board's Analysis Suffers from Important Flaws. .................................. 6

      A.      The Board's Safety and Soundness Analysis Impermissibly Narrowed Banks' Authority to Engage in Complementary Activities. ...................................................................................... 8

      B.      The Board Did Not Adequately Account for Canandaigua's Proposed Risk-Mitigation Strategy. .................................. 13

II.     This Petition Presents a Limited Dispute. ...................................... 19

CONCLUSION ................................................................................................. 23

CERTIFICATE OF COMPLIANCE.................................................................. 24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*City of Arlington v. FCC*,
569 U.S. 290 (2013)............................................................................................7

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
591 U.S. 1 (2020)..............................................................................................17

*FCC v. Fox Television Studios, Inc.*,
556 U.S. 502 (2009)..........................................................................................13

*Fischer v. United States*,
603 U.S. 480 (2024)..........................................................................................12

*Gulf Fed. Sav. & Loan Ass'n v. Fed. Home Loan Bank Bd.*,
651 F.2d 259 (5th Cir. 1981) ...........................................................................16

*Johnson v. Off. of Thrift Supervision*,
81 F.3d 195 (D.C. Cir. 1996)............................................................................16

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024)..........................................................................................10

*Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983)..........................................................................7, 13, 14, 17

*Nat. Res. Def. Council v. Abraham*,
355 F.3d 179 (2d Cir. 2004) ..............................................................................5

*PDK Lab'ys, Inc. v. DEA*,
362 F.3d 786 (D.C. Cir. 2004).......................................................................6, 19

*SEC v. Chenery Corp.*,
318 U.S. 80 (1943).........................................................................................7, 10

*Secs. Indus. Ass'n v. Bd. of Governors of Fed. Rsrv. Sys.*,
839 F.2d 47 (2d Cir. 1988) ................................................................................8

iii

*In re Seidman*,
37 F.3d 911 (3d Cir. 1994) ..................................................................16

**Statutes**

5 U.S.C. § 706..................................................................................7, 13, 19

12 U.S.C.
§ 29................................................................................................14, 18
§ 1843................................................ 2, 4, 5, 7, 8, 9, 10, 11, 13, 14, 18
§ 1848................................................................................................7

29 U.S.C. § 213 ....................................................................................11

Pub. L. No. 106-102, 112 Stat. 1338 (1999)................................................9

Pub. L. No. 84-511, 70 Stat. 133 (1956)....................................................8

**Regulatory Materials**

12 C.F.R. § 225.28 ..................................................................................9

*Unsafe or Unsound Practices, Matters Requiring Attention*, 90 Fed.
Reg. 48,835 (proposed Oct. 30, 2025)..............................................16

Citigroup, Inc., *Order Approving Notice to Engage in Activities
Complementary to a Financial Activity*, 89 Fed. Rsrv. Bulletin 508
(2003) ........................................................................................12

Deutsche Bank AG, *Order Approving Notice to Engage in Activities
Complementary to a Financial Activity*, 92 Fed. Rsrv. Bulletin C54
(2005)........................................................................................22

JPMorgan Chase & Co., *Order Approving Notice to Engage in
Activities Complementary to a Financial Activity*, 92 Fed. Rsrv.
Bulletin C57 (2005) ....................................................................22

Letter from Robert deV. Frierson, Deputy Sec'y of the Bd., Bd. of
Governors of the Fed. Rsrv. Sys., to Gregory A. Baer, Esq.,
Deputy Gen. Couns., Bank of America Corp. (Apr. 24, 2007)..........17

Royal Bank of Scotland Group plc, *Order Approving Notice to Engage in Activities Complementary to a Financial Activity*, 94 Fed. Rsrv. Bulletin C60 (2008)................................................................20

Société Générale, *Order Approving Notice to Engage in Activities Complementary to a Financial Activity*, 92 Fed. Rsrv. Bulletin C113 (2006) ...........................................................................................22

Wellpoint, Inc., *Order Determining that Certain Activities Are Complementary to the Financial Activity of Underwriting and Selling Health Insurance*, 93 Fed. Rsrv. Bulletin C133 (2007) .............17, 20, 22

**Other Authorities**

S. Rep. No. 106-44, 1999 WL 266803 (1999).........................................................21

Canandaigua Nat'l Corp., Bank Holding Company Performance Report (Sep. 30, 2025).........................................................................15

Dealbook, *All Eyes on Wachovia*, N.Y. Times (Sept. 26, 2008)............................18

Randy Guynn, Remarks at Ask the Fed, *in* Ask the Fed: Statement of Supervisory Operating Principles (SSOP) (Apr. 15, 2026)................................17

Statement of John D. Hawke Jr., Comptroller of the Currency, before the U.S. Senate Committee on Banking, Housing, and Urban Affairs, on the Financial Services Act of 1999, 1999 WL 587141 (Feb. 24, 1999).........................................................................................21

*Substantial*, Merriam-Webster Dictionary.................................................16

Wachovia Corp., Exhibit 19 to Quarterly Report (Form 10-Q), *Quarterly Financial Supplement: Management's Discussion and Analysis* (Aug. 11, 2008) ...............................................................18

## INTEREST OF AMICI CURIAE

The Bank Policy Institute ("BPI") is a nonpartisan public policy, research, and advocacy group that represents universal banks, regional banks, and major foreign banks doing business in the United States.[1] BPI produces academic research and analysis on regulatory and monetary policy topics, analyzes and comments on proposed regulations, and represents the financial services industry with respect to cybersecurity, fraud, and other information security issues.

Established in 1875, the American Bankers Association ("ABA") is the united voice of America's $23.4 trillion banking industry, comprised of small, regional, and large national and State banks that safeguard nearly $18.6 trillion in deposits, and extend more than $12.3 trillion in loans.

The New York Bankers Association ("NYBA") is a not-for-profit association of more than 100 community, regional, and money center commercial banks and savings associations located throughout New York state. NYBA's mission is to improve and promote a unified banking industry. NYBA's members have aggregate deposits of more than $2 trillion, annually lend more than $70 billion in home and small business loans, and employ nearly 200,000 people in New York State.

---

[1] Pursuant to Circuit Rule 29.1(b) and Federal Rule of Appellate Procedure 29(a)(4)(E), amici state that no party's counsel authored this brief in whole or in part and no person—other than amici, their members, or their counsel—contributed money intended to fund preparing or submitting this brief.

The Independent Community Bankers of America ("ICBA") has one mission: to create and promote an environment where community banks flourish. ICBA powers the potential of the nation's community banks through effective advocacy, education, and innovation. As local and trusted sources of credit, America's community banks leverage their relationship-based business model and innovative offerings to channel deposits into the neighborhoods they serve, creating jobs, fostering economic prosperity, and fueling their customers' financial goals and dreams.

This case presents an issue important to *Amici* and their members, which include some of the nation's largest financial institutions: how the Board of Governors of the Federal Reserve System ("Board") evaluates applications to engage in activities that are "complementary" to a financial activity under Section 4(k) of the Bank Holding Company Act ("BHC Act"). *See* 12 U.S.C. § 1843(k)(1)(B).

*Amici* and their members share a significant interest in ensuring that the Board properly applies the BHC Act when it makes determinations regarding the activities in which bank holding companies may permissibly engage. *Amici* submit this brief to draw the Court's attention to legal errors in the Board's analysis and to urge the

2

Court to resolve the case in a way that accounts for the broad range of other

circumstances that implicate Section 4(k) of the BHC Act.[2]

---

[2] *Amici* have authority to file this brief under Federal Rule of Appellate Procedure 29(a)(2) because all parties have consented to its filing.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Federal law generally prohibits banks and their affiliates from engaging in non-banking activities. To help banking organizations remain competitive, Congress established exceptions to that rule. In particular, Congress authorized a subset of bank holding companies that are well-capitalized and well-managed (called financial holding companies) to engage in an expanded set of non-banking activities. These expanded activities include activities that the Board of Governors of the Federal Reserve System has determined are complementary to a financial activity and do not pose a substantial risk to the safety or soundness of depository institutions or the financial system generally. *See* 12 U.S.C. § 1843(k)(1)(B).

This case concerns the Board's denial of a request by Canandaigua National Corporation ("Canandaigua") to engage in a limited-scope cash guarantee mortgage program under the authority Congress provided. *See* FRB Order No. 2025-17 (the "Order") (Oct. 17, 2025), *reproduced at* Petitioner's Appendix ("PA") 251.

*Amici* file this brief to inform the Court of the broader context in which this dispute is situated and to draw the Court's attention to flaws in the Order's analysis. Given those flaws, there is no need for the Court to reach a final conclusion regarding whether the BHC Act authorizes Canandaigua's request. The proper approach is to remand to the Board for further explanation or analysis, for two reasons.

4

First, the Board misconstrued the statutory framework that governs this dispute—the complementary activities authority contained in the Gramm-Leach-Bliley Act. *See* 12 U.S.C. § 1843(k)(1)(B). That authority is an exception to the general statutory prohibition on non-banking activities by bank holding companies. *See id.* § 1843(a)(2). The complementary activities authority thus by definition *expands* the range of permissible activities. But the Board's Order nullified Congress's design by denying Canandaigua's application because the proposed activity is a prohibited non-banking activity. If the Board's reasoning were correct, *nothing* would qualify as a complementary activity. Precedent counsels against giving the statute such a self-defeating interpretation. *See, e.g.*, *Nat. Res. Def. Council v. Abraham*, 355 F.3d 179, 197 (2d Cir. 2004) (rejecting interpretation that would have rendered a statute "inoperative, or a nullity").

Second, the Board did not adequately account for a crucial aspect of Canandaigua's proposal. Canandaigua agreed to limit any exposure to real estate flowing from its cash guarantee mortgage program to less than 0.1 percent of its assets (and around only one percent of its Tier 1 capital). The Board acknowledged the relevance of this risk-mitigation mechanism, but nevertheless disregarded it when conducting the statutory safety-and-soundness inquiry. *See* Order at 8-9 (PA258-259). This defect in the Board's analysis defied the Administrative

Procedure Act's requirement that agencies give satisfactory explanations for their decisions that account for all important aspects of an issue.

Each of these errors provides an independent ground for this Court to grant the Petition for Review and remand to the Board for further proceedings. *Amici* offer no prediction whether, with those deficiencies addressed, the Board could come to the same conclusion on remand. Whatever conclusion it reaches, however, the Court should be aware that this dispute—concerning a community bank's desire to compete more effectively with nonbank lenders in the Rochester, New York, real estate lending market—arises in the context of a statutory scheme that governs a broad range of other geographic markets and potential activities. Given that dynamic, and given the importance of the underlying legal issues to financial holding companies, *Amici* urge the Court to decide this case no more broadly than required. *Cf. PDK Lab'ys, Inc. v. DEA*, 362 F.3d 786, 799 (D.C. Cir. 2004) (Roberts, J., concurring in part and concurring in judgment) (citing "the cardinal principle of judicial restraint" that "if it is not necessary to decide more, it is necessary not to decide more").

## ARGUMENT

### I. The Board's Analysis Suffers from Important Flaws.

Congress has charged the Board with significant responsibilities in the regulation of bank holding companies. But like all agencies, the Board must act

within the confines of its statutory authority and comply with the Administrative Procedure Act's requirement of reasoned decision-making. *See, e.g., City of Arlington v. FCC*, 569 U.S. 290, 297 (2013) (Agencies' "power to act and how they are to act is authoritatively prescribed by Congress, so that when they act improperly, no less than when they act beyond their jurisdiction, what they do is ultra vires."). When the Board fails to observe either limitation on its power, the Administrative Procedure Act directs this Court to "hold unlawful and set aside" its actions. 5 U.S.C. § 706(2); *see also* 12 U.S.C. § 1848 (authorizing judicial review of Board orders).

In the Order under review, the Board breached both types of limitations. The Board misconstrued the relevant statutory authority—12 U.S.C. § 1843(k)(1)(B)—and it failed to engage in reasoned decision-making when it glossed over an "important aspect of the problem," namely, Canandaigua's offer to place significant quantitative limits on its potential exposure. *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Whatever the Board might have to say about those issues in a new order on remand, the Order under review here, and the analysis it relies upon, cannot be sustained. *See SEC v. Chenery Corp.*, 318 U.S. 80, 95 (1943) (holding that "an administrative order cannot be upheld unless the grounds upon which the agency acted in exercising its powers were those upon which its action can be sustained").

7

In all events, the Court should resolve this case based on its facts and in a way that avoids coloring future applications of the Board's complementary activity authorities in unanticipated or unintended ways. This case arises out of a single community bank's request to engage in a specialized mortgage lending program designed to incur no more than $5 million in exposure and be invoked in exceedingly narrow circumstances—by Canandaigua's estimate, at most two home purchases annually in one area of upstate New York. *See* Petitioner's Br. at 9-10. Despite those characteristics, the underlying legal issues have the potential to implicate a much broader range of activities unaddressed by the parties. By providing additional context regarding the Board's regulation of financial holding companies under the Gramm-Leach-Bliley Act, *Amici* hope to inform the Court of issues it should take care not to prejudice in its decision.

### A. The Board's Safety and Soundness Analysis Impermissibly Narrowed Banks' Authority to Engage in Complementary Activities.

Until the end of the twentieth century, Congress largely prohibited banks from engaging in "non-banking" activities to preserve the separation of banking and commerce. *See* Bank Holding Company Act of 1956, Pub. L. No. 84-511, § 4(a)(1), 70 Stat. 133, 135 (codified at 12 U.S.C. § 1843(a)(1)); *see also, e.g., Secs. Indus. Ass'n v. Bd. of Governors of Fed. Rsrv. Sys.*, 839 F.2d 47, 49 (2d Cir. 1988). Under that regime, bank holding companies (i.e., companies that own banks) generally

8

must limit their activities and investments to banking activities and activities that are "so closely related to banking as to be a proper incident thereto"—for example, extending credit, servicing loans, or acting as an investment adviser. *See* 12 U.S.C. §§ 1843(a)(2), (c)(8); 12 C.F.R. § 225.28(b). That limitation may have been intended to protect banks from commercial downturns, to the benefit of their depositors and the financial system, but it also hampers banks' ability to compete with non-banks. To address that problem and help banking organizations better compete with securities and insurance firms, Congress enacted the Gramm-Leach-Bliley Act, which created important additional exceptions to the general prohibition on non-banking activities. *See* Pub. L. No. 106-102, 112 Stat. 1338 (1999).

Among other things, the Gramm-Leach-Bliley Act created a new category of bank holding companies—known as "financial holding companies"—and authorized them to engage in expanded activities beyond what bank holding companies may undertake. To qualify as a financial holding company, a bank holding company and its depository institution subsidiaries must be well-capitalized, well-managed, and must file an election with the Board. *See* 12 U.S.C. § 1843(*l*). Congress authorized financial holding companies to engage not only in banking and activities "closely related to banking," but also in any activity that is either (1) "financial in nature or incidental to such financial activity," or (2) "complementary to a financial activity and does not pose a substantial risk to the safety or soundness

9

of depository institutions or the financial system generally." 12 U.S.C. § 1843(k)(1). And Congress did so "notwithstanding" existing restrictions on non-banking activities by bank holding companies, which remain intact. *Id*. This case concerns the second of financial holding companies' newly permitted statutory authorities— the ability to engage in complementary activities.

The Board denied Canandaigua's proposal based solely on its conclusion that the proposed cash guarantee mortgage program "would pose a substantial risk to the safety and soundness of Canandaigua Bank, depository institutions, or the financial system generally." Order at 10 (PA260); *but see id.* (reserving other potential grounds for disapproval). But the Board construed safety and soundness in a manner inconsistent with the statutory text and design of the complementary activities authority. And "an order may not stand if the agency has misconceived the law." *Chenery*, 318 U.S. at 94.[3]

---

[3] The Order suggests that the Board has "sole discretion" to determine whether an activity is complementary to a financial activity and whether it poses a substantial risk to safety and soundness. Order at 2 (PA252). The Board may have considerable authority in the first instance to find facts and apply the law, but "questions of law are for courts rather than agencies to decide." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 393 (2024) (citation omitted). Under the Administrative Procedure Act, this Court must "decide *all* relevant questions of law arising on review of agency action . . . and set aside any such action inconsistent with the law as [the Court] interpret[s] it." *Id.* at 392 (citation omitted). And the Order points to no aspect of the BHC Act that commits these matters to agency discretion or expressly delegates to it authority to determine the meaning of "substantial risk to the safety or soundness of depository institutions or the financial system generally." *Compare,*
(continued…)

10

The Board reasoned primarily that because the BHC Act does not include a blanket authorization for the purchase of real estate (which Canandaigua's proposal would require if guaranteed mortgages fall through), such purchases must pose a substantial risk to safety and soundness. *See, e.g.*, Order at 5 & n.16 (PA255) (noting that bank holding companies are "generally prohibited from investing in real property" and citing the general prohibition on nonbanking activities set forth in 12 U.S.C. § 1843(a)(2)); *see also* Order at 7 (PA257) ("Canandaigua's proposal is inconsistent with the general prohibition on banking organizations investing in real estate and would involve Canandaigua in precisely the type of real estate exposure that the prohibition is intended to prevent.").[4]

At the risk of stating the obvious, Canandaigua is a qualified financial holding company, and the Board was applying a statute that operates by granting authorities *in excess of* those already available to bank holding companies—a point the Order appears to recognize. *See* Order at 2 (PA252) (observing that Congress authorized

---

*e.g.*, 29 U.S.C. § 213(a)(15) (exempting from provisions of the Fair Labor Standards Act "any employee employed in domestic service employment to provide companionship services for individuals who (because of age or infirmity) are unable to care for themselves (*as such terms are defined and delimited by regulations of the Secretary*)" (emphasis added)). The Board's faulty construction of Section 1843(k) therefore is not entitled to deference.

[4] There are circumstances in which a bank holding company may own and/or invest in real property, such as real property that serves as premises where the company or its affiliates transact business. *See* 12 U.S.C. § 1843(c)(1).

11

complementary activities "to allow the Board to permit [financial holding companies] to engage, on a limited basis, in an activity that appears to be commercial rather than financial in nature"). If the Board could deny a financial holding company's application under the complementary activities authority whenever the underlying activity is not otherwise permitted for bank holding companies, no new "complementary activities" would be permitted and Congress's handiwork in adopting the Gramm-Leach-Bliley Act would have accomplished nothing. Moreover, contrary to settled principles of statutory interpretation, the complementary activities authority would not operate "notwithstanding" other prohibitions on non-banking activities as Congress prescribed. *See Fischer v. United States*, 603 U.S. 480, 486 (2024) (in construing statutes, courts "must give effect, if possible, to every clause and word of the statute" (alteration adopted and citation omitted)).

Perhaps unsurprisingly given that deficiency, the Board's reasoning is inconsistent with its prior orders. The Board, for instance, has previously recognized that there are "only" two "limitations" on complementary activities: (1) there must be "a connection between the nonfinancial activity and a financial activity conducted by the [financial holding company]" and (2) the proposed activity must not pose "unacceptable" safety and soundness risks. Citigroup, Inc., *Order Approving Notice to Engage in Activities Complementary to a Financial Activity*, 89 Fed. Rsrv.

12

Bulletin 508, 509 (2003). The Board has not previously assessed the safety and soundness of a proposed activity through the lens of whether it is a permissible banking activity. If the Board meant to break new ground in this way, it did not "display awareness that it [was] changing position," or justify its approach as the Administrative Procedure Act requires. *FCC v. Fox Television Studios, Inc.*, 556 U.S. 502, 515 (2009). And its Order may be set aside on that ground alone.

Regardless of whether as a factual matter Canandaigua's proposed cash guarantee mortgage program "pose[s] a substantial risk to the safety or soundness of depository institutions or the financial system generally," 12 U.S.C. § 1843(k)(1)(B), the manner in which the Board reached its conclusion was not consistent with the statute under which it acted and therefore the Order must be "set aside," 5 U.S.C. § 706(2).

### B. The Board Did Not Adequately Account for Canandaigua's Proposed Risk-Mitigation Strategy.

In denying Canandaigua's proposal, the Board was required to "articulate a satisfactory explanation for its action." *State Farm*, 463 U.S. at 43; *see also* 12 U.S.C. § 1843(j)(1)(C)(i) (providing that Canandaigua's notice "shall be deemed to be approved" unless "the Board issues an order disapproving the transaction or activity *and setting forth the reasons for disapproval*" (emphasis added)). An agency's explanation for its actions is not satisfactory—and is instead arbitrary and capricious—if it "fail[s] to consider an important aspect of the problem" or "runs

13

counter to the evidence before the agency." *State Farm*, 463 U.S. at 43. The Board's abbreviated analysis of Canandaigua's proposed risk mitigation suffers from these deficiencies.

Under the BHC Act, the Board may not authorize a non-banking activity under the complementary activity authority if the activity presents a "*substantial risk* to the safety or soundness of depository institutions or the financial system generally." 12 U.S.C. § 1843(k)(1)(B) (emphasis added). The Order acknowledges that Canandaigua's application incorporates features designed to mitigate safety and soundness risks. Most significantly, these features include a quantitative limit on Canandaigua's real estate holdings under the cash guarantee mortgage program: "purchases of any property under the guarantee would occur only if the aggregate value of real estate owned under the program after the purchase . . . would not exceed $5 million at any time." Order at 4 (PA254). Similar to banks that acquire real estate holdings through foreclosure, Canandaigua also committed to dispose promptly of any purchased real estate assets, to hold title to properties under the program for no longer than two years, and to guarantee purchases only where the purchase price does not exceed the pre-approved mortgage amount. *Id*.; *see also* 12 U.S.C. § 29 (five-year maximum holding period for real property acquired through foreclosure).

The Board conceded that Canandaigua's risk mitigation strategy was "relevant" to its analysis, but then proceeded to deem the cash guarantee mortgage

14

program prohibited "*regardless* of the proposed quantitative limit on the activity," due to "broader safety and soundness risks that would be associated with [financial holding companies] conducting the activity." Order at 8 (PA258) (emphasis added). Under the Board's analysis, then, financial holding companies owning any real estate, no matter the amount or value, for any amount of time, presents unacceptable risk because it leaves them "arguably" "more exposed" to risks associated with downturns in real estate that have led to prior bank failures. *Id*. at 9 (PA259).

That conclusion is insufficient. The Order does not explain how the limited degree of real estate ownership proposed by Canandaigua—even if adopted by every financial holding company nationwide—would pose the type of "substantial" safety and soundness risk necessary to justify a denial. To put Canandaigua's proposed quantitative cap into context, as of September 30, 2025, Canandaigua held $5.2 billion in assets and maintained $468 million in Tier 1 capital, available to absorb losses.[5] If Canandaigua were to hold the maximum amount of real estate allowable under its proposal and suffer a 100 percent loss of its holdings, the loss would amount to less than 0.1 percent of Canandaigua's assets and around one percent of its Tier 1 capital.

---

[5] *See* Canandaigua Nat'l Corp., Bank Holding Company Performance Report 5, 14 (Sep. 30, 2025), https://perma.cc/L37V-C6QY; *see also* Petitioner's Br. at 10.

15

The Order does not explain how that scenario could present a "substantial" safety and soundness risk when the underlying activity is conducted on such a limited basis, by Canandaigua or by other financial holding companies at some point in the future. And in the absence of any explanation from the Board, common sense, precedent, and past practice all point in the opposite direction. The plain meaning of "substantial" is "considerable in quantity" or "significantly great"—not negligible. *Substantial*, Merriam-Webster Dictionary, https://perma.cc/9HX2-EDXZ. Consistent with that plain meaning and in related contexts, courts and agencies have emphasized that unsafe and unsound practices are those that pose "material" risks or "threaten the financial integrity" of the institution conducting them. *Johnson v. Off. of Thrift Supervision*, 81 F.3d 195, 204 (D.C. Cir. 1996) (citation omitted); *accord In re Seidman*, 37 F.3d 911, 927-928 (3d Cir. 1994); *Gulf Fed. Sav. & Loan Ass'n v. Fed. Home Loan Bank Bd.*, 651 F.2d 259, 267 (5th Cir. 1981); *see also Unsafe or Unsound Practices, Matters Requiring Attention*, 90 Fed. Reg. 48,835, 48,838 (proposed Oct. 30, 2025) (to be codified at 12 C.F.R. pts. 4, 305) (defining "unsafe or unsound practice" as one that, among other things, has materially harmed the financial condition of an institution or is likely to cause such harm, or present a material risk of loss to the Deposit Insurance Fund).[6] And the

---

[6] In recent published remarks, the Director of the Board's Division of Supervision and Regulation stated that the Board interprets the phrase "unsafe or unsound (continued…)

Board has in the past authorized financial holding companies to engage in complementary activities to a greater extent than that proposed here.[7]

Perhaps the Board could in the future explain why—notwithstanding the foregoing—the risk posed by a program of such small scale is "substantial." *See Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 20-21 (2020) (describing agency's procedural options for elaborating on a prior decision). But the Board did not take that step. And neither the Board's counsel nor the Court may now "supply a reasoned basis for the agency's action that the agency itself has not given." *State Farm*, 463 U.S. at 43.

The closest the Order comes is suggesting that "arguably" Canandaigua's proposal could compare to activities that have led banks to suffer real-estate-related losses and to bank failures in past crises. Order at 8-9 (PA258-259). But that comparison is inapt because it fails to account for Canandaigua's proposed

---

practices" similarly to the OCC and FDIC. *See* Randy Guynn, Remarks at Ask the Fed, *in* Ask the Fed: Statement of Supervisory Operating Principles (SSOP) 6, 10 (Apr. 15, 2026), https://perma.cc/F378-QHWM.

[7] *See, e.g.,* Wellpoint, Inc., *Order Determining that Certain Activities Are Complementary to the Financial Activity of Underwriting and Selling Health Insurance* ("Wellpoint Order"), 93 Fed. Rsrv. Bulletin C133, C135 (2007) (limiting Wellpoint's activities to 5 percent of total capital and 2 percent of consolidated total assets or 5 percent of total annual revenue); Letter from Robert deV. Frierson, Deputy Sec'y of the Bd., Bd. of Governors of the Fed. Rsrv. Sys., to Gregory A. Baer, Esq., Deputy Gen. Couns., Bank of America Corp. (Apr. 24, 2007) at 2 & n.3, https://perma.cc/T8DU-M3F7 (limiting proposed commodities activities to 5 percent of Tier 1 capital and citing other orders with the same limit).

17

quantitative limit, which is a crucial aspect of the activity itself. Consider an example. During the 2008 financial crisis, which the Order cites as an instance where a decline in the real estate market induced a recession, Wachovia underwent a forced sale primarily because of its over-exposure to risky mortgage loans—unquestionably permissible lending activity—in an amount more than two times its available Tier 1 capital.[8] The Board cannot rest its decision on an apples-to-oranges comparison between a limited-scope program like the one Canandaigua proposes and the circumstances that have led to past crises without addressing such significant differences in scale.

That problem is especially profound given that Congress and the Board already permit banks to engage in some level of real estate holdings through foreclosures (among other contexts),[9] and the Board has not explained how Canandaigua's proposal would present meaningfully different risks from those permitted activities. While the Order notes that a bank holding company's ability to

---

[8] Wachovia Corp., Exhibit 19 to Quarterly Report (Form 10-Q), *Quarterly Financial Supplement: Management's Discussion and Analysis* (Aug. 11, 2008), https://perma.cc/4JF8-LRHB (stating that Wachovia held approximately $50 billion in Tier 1 capital as of June 30, 2008); Dealbook, *All Eyes on Wachovia*, N.Y. Times (Sept. 26, 2008), https://perma.cc/583W-K8M7 (citing "$120 billion worth of option adjustable-rate mortgages" that put Wachovia's capital at risk).

[9] *See* 12 U.S.C. § 29 (five-year holding period for disposition of real property acquired through foreclosure); *id.* § 1843(c)(2) (permitting bank holding companies to acquire shares in satisfaction of a debt previously contracted in good faith, subject to a two-year divestiture period).

18

hold properties acquired under foreclosure is intended to reduce credit risk, the Order fails to articulate why the genesis of a real estate holding has any bearing on the degree of financial risk that arises from the holding itself. *See* Order at 7-8 (PA257-258).

Setting aside the Order based on these failures of explanation would not necessarily prevent the Board from determining that Canandaigua's proposal should be disapproved. But the Order's shortcomings do mean the Board is required to try again. *See* 5 U.S.C. § 706(2).

## II. This Petition Presents a Limited Dispute.

*Amici* emphasize that this case arises from a specific factual context: Canandaigua's application concerns a discrete, specialized mortgage lending program that by its own terms is designed to be small and not broadly applied, with just $5 million in total exposure and an estimated two home purchases annually. *See* Petitioner's Br. at 9-10. In deciding whether the Board reasonably disallowed this highly specific program, the Court should bear in mind the "cardinal principle of judicial restraint" that "if it is not necessary to decide more, it is necessary not to decide more." *PDK Lab'ys*, 362 F.3d at 799 (Roberts, J., concurring in part and concurring in judgment). That principle ensures that a court seeing only one part of a broader picture, through the prism of a case that involves only one of many possible fact patterns and only a subset of many potentially relevant policy concerns, does

19

not inadvertently prejudice future disputes involving other contexts or considerations.

It is important to keep that principle in mind here because there are many other potential contexts in which financial holding companies may seek to undertake complementary activities that may be wholly unrelated to Canandaigua's proposed cash guarantee mortgage program or to real estate altogether.

As the Board has acknowledged, complementary activities are "designed to allow [financial holding companies] to remain competitive with other providers of financial services and to better provide financial services to their customers in a developing marketplace." Wellpoint Order, 93 Fed. Rsrv. Bulletin at C134. By engaging in complementary activities, financial holding companies "would not be disadvantaged by market developments if commercial activities"—which are conducted by banks' competitors—"evolve into financial activities or competitors find innovative ways to combine financial and nonfinancial activities." Royal Bank of Scotland Group plc, *Order Approving Notice to Engage in Activities Complementary to a Financial Activity*, 94 Fed. Rsrv. Bulletin C60, C60 (2008).

That hypothetical is grounded in the realities of today's competitive business environment, which is strikingly similar to the one that led Congress to enact the Gramm-Leach-Bliley Act almost 30 years ago. Then, as now, rapid technological change and increasing competition are remaking the provision of banking services,

20

with a seemingly exponential expansion in the number of nonbank financial intermediaries offering new customer products and services and becoming competitors to financial holding companies. The concerns animating the Gramm-Leach-Bliley Act, and in particular its provisions authorizing financial holding companies to engage in financial and complementary activities, thus apply equally today: "Technological and financial innovation, together with market pressures to offer consumers a wider array of services, are breaking down the traditional segmentation of the financial services marketplace"[10] and "barriers to efficiency could undermine the competitiveness of our financial institutions [and] their ability to innovate."[11]

Faced with those competitive pressures, financial holding companies may increasingly seek to engage in new complementary or other financial activities, and the Gramm-Leach-Bliley Act arms the Board with ample authority to enable banking organizations to evolve as products and services shift. To date, the Board has

---

[10] Statement of John D. Hawke Jr., Comptroller of the Currency, before the U.S. Senate Committee on Banking, Housing, and Urban Affairs, on the Financial Services Act of 1999, 1999 WL 587141, at *2 (Feb. 24, 1999).

[11] S. Rep. No. 106-44, 1999 WL 266803, at *5 (1999) (quoting then-Board Chair Greenspan).

21

exercised its authority sparingly and approved only a handful of complementary activities—and none since 2008.[12]

Given the Order's facial legal and explanatory deficiencies, the Court should avoid a broad ruling that could limit future applications of complementary activity authorities in unanticipated or unintended ways. The Court need not opine, for example, on the outer boundaries of financial holding companies' ability to engage in complementary activities, or the scope of the Board's discretion in connection with approving those activities, to resolve this case. The Court can and should resolve Canandaigua's petition based solely on the defects laid out above; it need not go further than requiring the Board to reconsider Canandaigua's proposal by applying the law faithfully and reaching its conclusions rationally.

---

[12] These approvals primarily concerned commodities-related trading activities by large bank organizations and energy management activities. *See, e.g.,* JPMorgan Chase & Co., *Order Approving Notice to Engage in Activities Complementary to a Financial Activity*, 92 Fed. Rsrv. Bulletin C57 (2005); Deutsche Bank AG, *Order Approving Notice to Engage in Activities Complementary to a Financial Activity*, 92 Fed. Rsrv. Bulletin C54 (2005); Société Générale, *Order Approving Notice to Engage in Activities Complementary to a Financial Activity*, 92 Fed. Rsrv. Bulletin C113 (2006). The Board also authorized a health insurer seeking an industrial bank charter to engage in certain disease management and mail order pharmacy services. Wellpoint Order, 93 Fed. Rsrv. Bulletin at C134-135.

**CONCLUSION**

For the foregoing reasons, the Court should grant the Petition for Review and remand the case to the Board for further consideration and analysis.

Respectfully Submitted

/s/ *Kevin F. King*

| | |
|---|---|
| Gregg L. Rozansky | Kevin F. King |
| Tabitha Edgens | Randy Benjenk |
| THE BANK POLICY INSTITUTE | Matthew C. Quallen |
| 600 Thirteenth Street, NW | COVINGTON & BURLING LLP |
| Suite 400 | One City Center |
| Washington, DC 20005 | 850 Tenth Street NW |
| (202) 289-4322 | Washington, DC 20001 |
| | (202) 662-5488 |
| | kking@cov.com |
| | |
| | Meghann E. Donahue |
| | COVINGTON & BURLING LLP |
| | 30 Hudson Yards |
| | New York, NY 10001 |

*Counsel for Amici Curiae*

April 28, 2026

23

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing brief complies with the type-volume limitation of Circuit Rules 29.1(c) and 32.1(a)(4)(A) because it contains 5,010 words, excluding those parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft® Word for Microsoft 365 MSO (Version 2510) in 14-point Times New Roman font.

/s/ *Kevin F. King*

Kevin F. King
*Counsel for Amici Curiae*

April 28, 2026

24